LADD et al., Appellants, v. STEPHENS et al.

In Banc, December 23, 1898.*

1. **Administration: JUDGMENTS: RES ADJUDICATA.** Exceptions by the heirs to a final settlement relating to matters with respect to which judgments by courts of competent jurisdiction have been entered, which judgments have been certified to the probate court, classified by it, and paid by the administrator and the payment approved by that court, can not be inquired into by any court thereafter, for such matters have become *res adjudicata*.

2. ————: **ALLOWANCES: PRIMA FACIE CORRECT: PRACTICE.** Allowances by the probate court are *prima facie* correct, and where exceptors have made no attempt to support exceptions thereto, they will not be considered on appeal to the Supreme Court.

3. ————: **ADVANCEMENT: BRINGING INTO HOTCHPOT.** An heir is entitled to have the court determine whether certain property he has received from the intestate was a gift or an advancement. And he is not debarred from participation in the estate because he did not bring such property into hotchpot before such question was judicially determined.

4. ————: ————: **FINDING OF REFEREE: NO EXCEPTION: PRACTICE.** Although property presented by the intestate to his children is clearly a gift, and not an advancement, yet if the referee and the court find it to have been an advancement, and the children do not except to such finding, it must be held to be an advancement.

5. ————: ————: **VALUE FIXED BY INTESTATE.** The heir to whom an advancement has been made is to be charged in the hotchpot with the value fixed upon the property by the parent at the time the advancement was made, and not with what it was then really worth. Nor can dividends earned by such property, nor interest on the sum advanced, be charged.

6. ————: **COMMISSIONS.** Administrators are entitled to commissions on the *actual* value of the assets distributed by them.

* NOTE.—Decided November 21, 1898. Motion for rehearing filed; overruled December 23, 1898.

7. ——— : ——— : WHEN ALLOWED. Allowance of the administrator's commissions may be made at any time by any court before which his accounts or settlements are drawn in question.

8. ——— : EXPENSES. Administrators, in addition to their commissions, are entitled to traveling expenses incurred in the care and preservation of the estate.

9. ——— : DISTRIBUTION IN KIND. Complaint can not be sustained to a distribution of personal property in kind, made without commissioners having been appointed to put a valuation thereon, if an equal amount of each class of such property (stocks), was distributed to each distributee, and all the distributees accepted the same, and gave acquittances to the administrator.

*Appeal from Howard Circuit Court.*—HON. JOHN A. HOCKADAY, Judge.

AFFIRMED.

JOHN COSGROVE and UPTON M. YOUNG for appellants.

(1) By section 4470, Revised Statutes 1889, all children of an intestate, who have received in his lifetime any real or personal estate by way of advancement, are required to report said advancements at the time they choose to come into partition with other parceners. They can not wait to see if the fact of their advancements is brought to light, and then claim that by accepting a distributive share of the intestate estate, such acceptance is, in legal effect, a bringing into hotchpot of such advancements. They must first bring in or report the advancements, and not wait until compelled to do so. Estate of Williams, 62 Mo. App. 339; 2 Story on Eq. Jur., chap. 9; Williams on Executors, pp. 1239 and 1240; Grattan v. Grattan, 18 Ill. 167. (2) A refusal to voluntarily come into hotchpot debars persons advanced of all right to share in the distribution of the intestate estate. In re St. Vrain, 1 Mo. App. 294; In re Elliott, 98 Mo. 379; Estate of Williams, 62 Mo. App. 339; Ray v. Loper, 65 Mo.

470; Gunn v. Thurston, 130 Mo. 339; Nelson v. Nelson, 90 Mo. 460; Grattan v. Grattan, 18 Ill. 167; Taylor v. Reese, 4 Ala. 121; Powell v. Powell, 5 Dana, 168.    (3)  W. S. Stephens, L. V. Stephens and Mrs. Leonard, having received advancements from their father in his lifetime, and having failed to report the advancements, or bring them in with the other parceners, if not deprived of any right to share in the distribution, should at least be compelled to restore, or bring into the corpus of the estate, the entire earnings and income arising from such advancements.    More v. Barrow, 89 Tenn. 101; Johnson v. Patterson, 13 Lea, 632; Williams v. Williams, 15 Lea, 438; Steel v. Ferguson, 85 Tenn. 434; Ex parte Glenn, 20 S. C. 164; Kyle v. Conrad, 25 W. Va. 760. (4)  Value of advancements.  Ray v. Loper, 65 Mo. 470; Jackson v. Jackson, 28 Miss. 674.    (5)  Mrs. W. M. Ladd has an interest in the advancements, and in all rights arising therefrom.    Littleton v. Littleton, 1 Devereux & Battle's Law Report* (N. C.), 327.    (6)  The indebtedness of Lon V. Stephens, one of the administrators, to the estate, was an asset that should have been inventoried.  R. S. 1879, R. S. 1889, both sec. 98.    (7)  If the evidence of Mrs. Leonard was competent to establish the fact that J. L. Stephens expressed his intention to make a gift to L. V. Stephens, the evidence was not sufficient to establish the gift. There was no delivery of the thing constituting the gift, which was essential to make it valid.    Gartside v. Pohlman, 15 Mo. App. 160; Thomas v. Thomas, 107 Mo. 459; Dougherty v. Hasel, 91 Mo. 161; Nasse v. Thomas, 39 Mo. App. 178.    (8)  The administrators were only entitled (if to anything) to commissions on the amount actually disbursed at the time of the allowance of commissions.  All commissions charged and taken by the administrators in excess of those actually earned, constituted a conversion of such excess.    These administrators are not entitled to any commissions, as the administration was not faithful.    State ex rel.

v. Berning, 74 Mo. 100; Brook v. Jackson, 125 Mass. 307; 2 Woerner's Am. Law of Admin., sec. 526; Jenison v. Hapgood, 10 Pick. 77; Clauser's Estate, 84 Pa. St. 51. (9) The administrators were entitled only (if to anything) to an allowance of five per cent commission, on the amount of the estate which passed through their hands, at the date of each allowance. They were not entitled to any allowance for traveling expenses. Williams, Adm'r, v. Williams, 62 Mo. 460; Jacobs v. Jacobs, 99 Mo. 427. (10) Mrs. Ladd was entitled to the whole of dividends numbers 29 and 34, declared by the Central National Bank, as her absolute property. Upon the face of the record, these dividends were earnings, and no part of the original estate of J. L. Stephens, owned by him at the date of his death. Taylor on Private Corp., 568. (11) The referee should have examined the whole case—all the annual and final settlements; having failed to do so, the circuit court should have done this. It was not essential that exceptions should have been filed to each error complained of, to enable the referee to have examined the whole case upon appeal from the final settlement of the administrators. The whole case was opened for reexamination when the appeal was taken from the final settlement. In re Estate of Glover and Shepley, 127 Mo. 153. (12) Administrators distributed "in kind," in violation of the law—no commissioners having been appointed. R. S. 1879, sec. 247.

W. M. WILLIAMS for respondents.

(1) The referee's report stands as a special verdict or finding of the facts and, when it comes to this court, with the approval of the trial judge, is, even in an equity case, entitled to weight and consideration. Darling v. Potts, 118 Mo. 506. (2) The testimony shows that these children treated these birthday presents as gifts from their father, and never understood that it was claimed that they were advance-

ments, until these proceedings were instituted. They were never asked to bring them into "hotchpot" until the final settlement; nor have they ever at any time refused to do so. *First.* The claim is set up, that they should be precluded from any part in, or share of their father's estate, on the ground that they chose to come into partition with the other parceners, and received their share of the estate, and then submitted to the court, for its determination, the question as to what, if anything, should be charged to them as advancements, and at what value. This position is untenable, and finds no support in the language of the statute, or in the adjudicated cases. (a) The language of the statute does not admit of any such construction. 1 R. S. 1889, sec. 4470; Hamer v. Hamer, 4 Strabhart's Eq. 124. (b) If the meaning of the statute was doubtful, which, however, it is not, it should not be given an unreasonable interpretation. (c) There have been a number of cases in our appellate courts, where the heirs, after sharing in some of the distributions of the estate, have, upon the final distribution, contested the question of advancement through the probate, circuit and supreme courts. It has never been even hinted or suggested, that such heir had done anything that would work a forfeiture of his entire estate, because he had availed himself of the legal right to have the courts determine, whether he should be charged with an alleged advancement, and at what price. In re Elliott's Estate, 98 Mo. 379; s. c., 27 Mo. App. 218; Gunn v. Thurston, 130 Mo. 339; Alleman v. Manning, 44 Mo. 4; Ray v. Loper. 65 Mo. 470; Nelson v. Nelson, 90 Mo. 460; Spradling v. Conway, 51 Mo. 51; McReynolds v. Gentry, 14 Mo. 485. (d) The absence in any case, where such a forfeiture has been adjudged, during the long existence of the statute, certainly goes far to show that no such harsh and unreasonable construction should be given to this enactment. *Second.* The question of advancements, however, is not properly in this case at all. The

probate court had authority to make distribution at the annual settlements, and these orders were subject to appeal. R. S. 1889, secs. 239 and 285; In re Elliott Estate, 98 Mo. 379. There was nothing to distribute, upon the final settlement in this case, and no order of distribution to make. *Third.* The question of advancements only concerns the children of the deceased. The widow is not entitled to any part of them. She is here claiming under, and relies upon the marriage contract, as fixing her rights. McReynolds v. Gentry, 14 Mo. 485; Thornton on Gifts, sec. 605. *Fourth.* Advancements should be valued at the price fixed upon them by the deceased. His intention must govern in that particular. Ray v. Loper, 65 Mo. 470; Short v. Taylor, 137 Mo. 519. *Fifth.* The appellants seem further to contend, that all the income and profits received by an heir, or earned from gifts of a parent, should be charged in addition to the property itself, that "the tree and its fruits" should be brought into "hotchpot." The rule is otherwise. It is only the value of the parental gift that is to be made the basis of the charge. Thornton on Gifts and Advancements, sec. 615; Ray v. Loper, 65 Mo. 470. *Sixth.* The appellants made no claim before the referee that interest should be charged upon the advancements. They tried their case upon the theory that the respondents and their oldest sister should be excluded from any share of their father's estate. They can not now complain that the referee only passed upon the case upon the theory upon which they presented it. Interest, however, should not have been charged, under the rule of this State. Nelson v. Wyan, 21 Mo. 347; Osgood v. Breed, 3 Pick. 356; Alleman v. Manning, 44 Mo. App. 4; In re Elliott Estate, 98 Mo. 379; Nelson v. Nelson, 90 Mo. 470; Ray v. Loper, 65 Mo. 470. (3) The allowances made by the probate court in the annual settlements are *prima facie* correct, and it devolved upon appellants to offer at least some evidence tending to overthrow them, before it can properly be claimed

that the referee should have rejected them. Myers v. Myers, 98 Mo. 262; McPike v. McPike, 116 Mo. 216. (4) The circuit court had precisely the same power to correct errors against the administrators that was possessed by the probate court. The matter stands upon an entirely different basis from an appeal to a court of errors, where only the party appealing can complain of the judgment below. McPike v. McPike, 111 Mo. 216. (5) The administrators were entitled to commissions on the actual value of the assets shown by the evidence before the referee to have been administered by them, and not merely upon the par value. Glover v. Holliday, 109 Mo. 108; Hitchcox v. Moser, 106 Mo. 578. No commissions were asked, charged, or allowed on the worthless railroad stock, or other worthless stock, as claimed by appellants. (6) Administrators are not only entitled to the commissions provided by statute, but may also be allowed reasonable charges for collecting and preserving the estate, and it has been held that traveling expenses may be included. R. S. 1889, p. 222; Pettigrew v. Williams, 62 Mo. 460. (7) The judgment of allowance of the probate court is as conclusive as the judgment of any other court, and can not be opened upon any other ground except such as would apply equally to the judgments of other courts. Munday v. Leper, 120 Mo. 417; Macey v. Stark, 116 Mo. 481; Murphy v. DeFrance, 105 Mo. 53; Rogers v. Johnson, 125 Mo. 202; Price v. The Springfield Real Estate Ass'n, 101 Mo. 202. (a) In addition to the fact that these judgments were regularly rendered by the probate court, the credits for payment thereof were allowed in an approved annual settlement. Myers v. Myers, 98 Mo. 262; McPike v. McPike, 111 Mo. 216. (b) Further, the administrators had the right to carry out the contracts of the deceased, and money, found by the probate court to have been expended in that way, was properly allowed in their settlements, even if there had not been a formal judgment rendered therefor against

the estate, as was done in this case.    Bambrick v. The Webster Groves Presbyterian Church Ass'n, 53 Mo. App. 225; Rowell v. Powell, Adm'r, 23 Mo. App. 365; Lockhardt v. Forsythe, 49 Mo. App. 464.

MARSHALL, J.—Appeal from the final settlement of W. Speed Stephens and Lon V. Stephens, administrators of the estate of their father, Joseph L. Stephens, deceased.

The parties complaining are Fannie E. Ladd (the former widow, by second marriage, of Joseph L. Stephens, since remarried to William M. Ladd), William M. Ladd her husband, and Curtis G. Stephens and Joseph L. Stephens, minors, children of the second marriage, by their curator, etc., and the defendants are William Speed Stephens and Lon V. Stephens, children of the first marriage, as administrators of their father's estate

By his first marrige Joseph L. Stephens had six children, who survived him, namely, William Speed Stephens, Lon V. Stephens, Mittie N. Stephens (now Mrs. Leonard), Alexander H. Stephens, Rhoda E. Stephens (now Mrs. Johnson), and Maggie B. Stephens (now Mrs. Moore).

In 1878 Joseph L. Stephens married Miss Fannie Jones, by which union there were born Curtis G. and Joseph L., who are still minors.

There was an ante-nuptial contract between Joseph L. Stephens and Miss Fannie Jones, by which it was agreed that instead of dower, she should retain her own property, and if she survived him, she should take a child's share of his property, for life, remainder after her death, to go to the heirs at law of Joseph L. Stephens.

Joseph L. Stephens died on August 11, 1881, and on the fifth of September, 1881, his two sons, defendants herein, were appointed and duly qualified as the administrators of his estate.    Within two years thereafter the estate was substantially administered, the debts paid, and nearly all of the prop-

erty distributed under the direction of the probate court. The administrators advertised that they would make final settlement at the September term, 1883, but at that time no trustee for Mrs. Ladd, and no curator for the minor children of the second marriage had been appointed, so the matter was allowed to remain open until the December term, 1884; when the probate court continued the final settlement until further order of the court. At the suit of Mrs. Ladd, the circuit court of Cooper county on November 14, 1885, appointed J. T. Pigott her trustee. The administrators advertised a second time that they would make final settlement at the March term, 1893, and at that term filed their statements, vouchers, notice, etc., and the matter was set for June 16, but was continued from day to day until June 22, 1893, on which day Mrs. Ladd and her minor children filed exceptions to the final settlement, setting up the following claims:

1. That Mrs. Ladd claimed one-ninth of the estate *absolutely*.

2. That when W. Speed Stephens, Lon V. Stephens and Mittie Leonard, respectively, became of legal age, their father *advanced* them a large sum of money, unknown, but believed to be more than five thousand dollars each.

3. That their father educated W. Speed Stephens, Lon V. Stephens, and Mittie Leonard, at an expense of over $3,000 each.

The exceptors asked that the alleged advances be brought into hotchpot, or failing so to do, that these heirs be debarred from any distributive share of the estate; that the court ascertain an amount equal to the sums expended by their father for the education of the three children aforesaid, and allow a similar amount for the education of the minor children of the second marriage; that the court appoint an expert accountant to verify the settlements of the administrators and ascertain whether any error or omission or improper charges or allowances were embodied in the settlements; that a large

amount of worthless stocks were inventoried at their face value of more than $165,000, and asked the court to ascertain what, if any, commission the administrators had charged on these worthless stocks and other worthless notes or accounts.

The probate court heard the exceptions, and on July 8, 1893, overruled them, and approved the final settlement, and exceptors appealed. After the case reached the circuit court, exceptors (on October 16, 1893), applied for a change of venue, which (on January 30, 1894), was granted, and the case was sent to the circuit court of Howard county. By consent of parties, and on order of the court, Thomas B. Wright was appointed referee, and the cause continued from term to term until March 26, 1895, when the referee filed his report.

The referee began the hearing on June 28, 1894, and continued it from time to time, and concluded it on August 20, 1894. Thereafter on September 21, certain other facts were agreed to by stipulation, in which it was also agreed that the case should be finally closed and submitted to the referee. W. Speed Stephens and Lon V. Stephens, were examined orally at great length, and Mrs. Mittie Leonard's testimony, as was also that of Mrs. Fannie Ladd, was submitted in writing.

On the thirtieth day of July, 1894, exceptors filed *before the referee,* thirteen additional exceptions, and on the eighth of November, 1894 (forty-eight days after the case before the referee was *finally closed*), the exceptors handed the referee fifty-one *additional exceptions.* No objection was made by defendants to this loose practice, and the referee considered and acted on all the exceptions, and on the twenty-sixth of March, 1895, he made his report to the circuit court. He sustained the exceptions numbered 1, 2, 5, 6 and 7, relating to stocks given by J. L. Stephens to W. Speed Stephens, Lon V. Stephens and Mittie Leonard, held them to be advancements, and not gifts, required them to be brought into

hotchpot, and charged the administrators $15,000 in respect thereof. He sustained exception number 9, relating to two mirrors, and one leather back chair, which had been appraised at $215, and which the administrators had purchased at public sale for $110, and charged them with $105, difference between the price they brought at public sale, and what the referee found to be their true value. He sustained exception number 22, and charged the administrators with $265, which he found to be the difference between the face value and the actual value of stock of the Central National Bank of Boonville, which the administrators had sold to J. M. Nelson, in order to distribute the personal property under the order of the probate court. Thus the referee surcharged the administrator's account with $15,370, and he readjusted the commission account of the administrators by allowing them $5,523.39, and found a balance in the hands of the administrators of $9,846.61, which he divided as follows: one-eighth to Mittie Leonard; one-eighth to Curtis G. Stephens; one-eighth to Joseph L. Stephens, and five-eighths to W. Speed Stephens and Lon V. Stephens (they having two-eighths in their own right, and three-eighths as assignees of Alexander H. Stephens, Rhoda and Maggie B. Stephens, under a disclaimer and release executed by them on July 17, 1894).

The exceptors filed thirty-one exceptions to the report of the referee. The circuit court of Howard county, Hon. John A. Hockaday, Judge, presiding, heard the exceptions and overruled them, and entered judgment approving the final settlement; and made final distribution as recommended by the referee. The exceptors filed a motion for new trial, specifying seventeen errors of the circuit court. The motion for new trial being overruled, the exceptors appealed to this court.

I.

It thus appears that the exceptions originally filed in the probate court only set up three causes of complaint, one,

that Mrs. Ladd was not allowed one-ninth of the estate abso-
lutely; one, charging that W. Speed Stephens and Lon V.
Stephens and Mittie Leonard had received large advances
from their father during his lifetime; and one, that W. Speed
Stephens, Lon V. Stephens and Mittie Leonard had been edu-
cated by their father at an expense of $3,000 each, and the
prayer of the exceptors was that the advancements should be
brought into hotchpot, or that those heirs should be debarred
from any distributive share in the estate, and that the chil-
dren of Mrs. Ladd should be allowed a sum equal to that de-
voted to the education of the older children by the first mar-
riage.    This was the issue tried in the probate court.    Upon
appeal to the circuit court, and after the case had been sent to
a referee, and the trial had been in progress before the referee
more than thirty days, the exceptors filed before the referee
(not in the circuit court, or by its leave); thirteen additional
exceptions, and forty-eight days after the trial before the ref-
eree had been finally closed the exceptors filed fifty-one addi-
tional exceptions.

Of all these exceptions the referee sustained those num-
bered 1, 2, 5, 6, 7, 9 and 22.    Those numbered 1, 2, 5, 6, and
7, related to advancements; that numbered 9 related to two
mirrors and one leather back chair which the administrators
had bought at the public sale; and that numbered 22 related
to the difference in the value of certain stock of the Central
National Bank of Boonville, which had been sold by the ad-
ministrators, of all of which more will hereafter be said.

Exceptions numbered 16, 17, 28, 29, 30, 31, 32, 33, 34,
35, 36 and 41, related to matters with respect to which judg-
ments had been entered by courts of competent jurisdiction,
those judgments had been certified to the probate court, and
classified by it, and paid by the administrators and had been
approved by that court.    It was, therefore, not within the
power of the exceptors, the administrators, the probate court,
the referee, or the circuit court in this case to inquire into

them. They were *res adjudicata.* These exceptions will, therefore, not be further considered here.

Exceptions numbered 18 and 38 were abandoned by the exceptors.

Exceptions numbered 10, 11, 21, 25, 26, 27, 31, 37, 40, 40½, 49, 52, 53, 56, 59, 62, 64, 66 and 67 will likewise be discarded from further consideration because the exceptors made no attempt whatever to support them. They related to matters which had been allowed by the probate court, and consequently are *prima facie* right and proper. [Myers v. Myers, 98 Mo. loc. cit. 268.] The exceptors introduced absolutely no evidence whatever to impeach the correctness of these allowances, and the referee properly found that there was no evidence upon which to predicate a claim against the defendants with regard to them.

Thus stripped of matters not here open to review, the case naturally divides itself into three classes; first, advancements; second, commissions; and third, mal-administration.

(a) : *Advancements.*—It appears that when W. Speed Stephens attained his majority, his father gave him fifty shares of stock of the Central National Bank of Boonville, of the par value of $5,000, but which the books showed was then worth $8,000. He required his son to enter into a written contract with him, in which it was recited that he had *given* his son the sum of *$5,000,* and that it was upon condition that he should not become surety during his father's lifetime without his consent, and in consideration of such gift the son so bound himself, and stipulated that if he violated the agreement he should return to his father the sum of $5,000.

On his son Lon V. Stephens attaining his majority his father gave him also fifty shares of stock in the Central National Bank of Boonville, of the par value of $5,000, but which the books showed at that time was worth $9,200, and required him to enter into a written contract similar to that made by his brother W. Speed Stephens.

When Miss Mittie Stephens (now Mrs. Leonard), attained her majority her father wrote to the President of the Moniteau National Bank as follows:

"Boonville, Mo., Oct. 19, 1880.
"R. Q. Roach, Esq., Pt.,
          California, Mo.
"Dear Sir:
    "Enclosed please find No. 12, my C. S. in your bank, $10,000.   Desiring to make a present or advancement of some of my best property to my daughter, I request that you issue to her brother, W. Speed Stephens, Trustee, for Mittie N. Stephens, $5,000 of my stock, and the balance in new C. S. to myself.                    Truly, J. L. Stephens."

On the stub of the bank stock issued to W. Speed Stephens was written in the handwriting of J. L. Stephens the word "advancement, etc." A similar memorandum, also in his writing, appeared on the stub of the stock issued to Lon V. Stephens, but in neither instance did it appear when the memorandum was made.   None of these children signed a receipt for the stock on the stock book.

The father died on the eleventh of August, 1881.   Nothing was ever said by any one concerning these so-called advancements until June 22, 1893, ten years after the final settlement had been advertised by the administrators, when, for the first time, Mrs. Ladd and her minor children raised the question as to them.   At first it was only claimed that these heirs should bring their advancement into hotchpot, or else be debarred from participation in the distribution of the estate.   The heirs contended that they were not advancements, but were gifts which they were not obliged to bring into hotchpot.   The probate court so held.   The referee, however, construed them to be advancements, and as the heirs had already received nearly the whole of their distributive shares,

he directed them to bring in these advancements and charged
them against the administrator's account.  The exceptors,
however, contended that they should be accounted for as of
their actual value at the time they were made and that "the
fruit should go with the tree," and all dividends on the stock
received by them should likewise be brought into hotchpot,
together with interest on the whole.

An heir has a right to have a judicial determination of
the question as to whether money or property received from a
parent shall be regarded as a gift or as an advancement.  It
would be manifestly unjust to debar an heir from participation
in a parent's estate because he failed to bring into hotchpot
some insignificant gift, as he regarded it, which might after-
wards be treated as an advancement.  These heirs concealed
nothing from the remaining heirs of the estate concerning
this matter.  They were guilty of no wrong to their co-heirs
in asking a judicial interpretation of whether it was a gift or
advancement.  The referee held it to be an advancement, and
these heirs submitted to that ruling and took no appeal.
There is abundant basis upon which the referee might well
have found otherwise.  The contracts between W. Speed
Stephens and Lon V. Stephens and their father clearly ex-
clude the idea of advancements, and the letter of her father,
directing the issuance of $5,000 of his stock to a trustee for
Mittie Stephens' benefit, speaks of it as a "present or advance-
ment."  Clearly the donor did not use the word "advancement"
in its legal acceptation; else he would not also have used the
word "present," and it is equally clear that he did not regard
the stock given to his sons as an advancement, or he would not
have provided that they should return to him $5,000 if they
became surety during his life.  Still the referee has so found,
and the heirs have not excepted.  The referee required the
heirs to bring in $5,000 each.  The exceptors claimed that
he should have required them to bring in $23,400, that is, the
actual and not the par value of the stock.  In Ray v. Loper,

65 Mo. 473, this court laid down the rule that, "When the parent gives property to the child he may at the time fix upon it what value he pleases as an advancement, or he may do so in the will." In this case the parent fixed $5,000 as the value of each advancement. He speaks of $5,000 in the contracts with his sons, and he directs $5,000 of his stock to be issued to his daughter's trustee. · This was a clear fixing by the ancestor of the value of the property, and the referee properly held that the heir should bring that much money into hotchpot. The dividends or interest derived from the advancement were properly excluded. With as much justice it could be required that an heir who had been given land as an advancement should account for the crops raised on it, or the heir who had been given a dwelling house as an advancement should account for the use and occupation of it, as to require the heir who received the stock to account for the earnings thereon. [Thornton on Gifts, secs. 608, 611, 613, 614, 615, 616.] It follows, therefore, that the judgment of the referee and of the circuit court was proper with respect to the value placed on the advancement.

(b) : *Commissions.*—Exceptions numbered 8, 12, 19, 42, 46, 51, 55, 58, 61, 63, 64 and 65, relate to commissions allowed by the probate court to the administrators. All except numbers 8 and 12 are of the group of exceptions which were filed two months after the trial of the case had closed before the referee, and of these, number 8 refers to a commission of five per cent taken by and allowed to the administrators on the distribution of property amounting to $129,750, under an order of the probate court; and number 12 relates to commissions charged on dividends on one hundred and fifty-five shares of stock of the Central National Bank, which constituted a part of the life estate of Mrs. Ladd. As to the first, it consisted of the stock of the estate in the Central National Bank, amounting on its face to $139,500, but which was of the market value of $292,950, and as this was distrib-

uted among the heirs, the administrators were entitled to their commission of five per cent on the personal property so distributed. As to the second, it appeared that Mrs. Ladd had only a life estate in the stock and had no trustee to whom the administrators could turn over the property, so under an order of the court it was held by them until after she had Mr. Pigott appointed trustee, in 1885, when the stock was turned over to him, with all dividends that had in the meantime accrued thereon. The total amount of property distributed by the administrators was $490,237.61. Five per cent commission on this sum amounts to $24,511.88. The probate court had allowed the administrators only the sum of $18,988.49, or $5,523.39 less than their lawful commission. The referee, on restating the account, required the administrators to bring into hotchpot the advancements, held them responsible for $265 premium on the sale of stock in the Central National Bank, made in order to distribute the property, and $105, the difference between the appraised value of two mirrors and one leather chair purchased by the administrators at the public sale of the personal property and their value as found by the referee, aggregating $15,370, and gave them credit for $5,-523.39 commissions, to which they were entitled as aforesaid, but which had not been allowed them by the probate court, and found the balance in the hands of the administrators to be $9,846.61. There can be no objection to this action of the referee in allowing these commissions. [Lund v. Lund, 41 N. H. loc. cit. 364.] Administrators are entitled to commissions on the actual value of the assets distributed by them [Glover v. Holliday, 109 Mo. 108; Hitchcock v. Mosher, 106 Mo. 578]; and this allowance may be made at any time by any court before which these accounts are drawn in question.

Objection is made to amounts charged by the administrators for traveling expenses in the care and preservation of the estate. Such charges are proper, in addition to commissions.

[Williams v. Petticrew, 62 Mo. 460; Pearson v. Darrington, 32 Ala. 227.]

(c): *Mal-administration.*—Exceptions 3 and 4 are based upon alleged loans made by J. L. Stephens to Lon V. Stephens, his son. Nearly all the items objected to, and there are quite a number of them, were amounts of money given to or expended for Lon V. Stephens during his minority.   Of those subsequent to his majority only one, dated September 17, 1880, with the word "lent" following, written on the stub of the check book, by some one other than the father or son, is seriously called in question.   The testimony shows that Mr. Stephens gave this check to his son as a wedding present. This testimony is absolutely uncontradicted.   No further attention need, therefore, be given to these exceptions.

The 13th exception complains of an improper payment of $764.00 to Thomas J. Portis, on the thirty-first of October, 1887.   It appeared from the evidence that Mr. Portis had been employed by Mr. Stephens before his death, and his employment continued by the administrators after their father's death, as an attorney to look after some railroad matters. There was a difference between the administrators and Mr. Portis which was adjusted by the probate court, the money was paid, and the administrators allowed credit for it.   The exceptors introduced no evidence whatever impeaching this allowance, and it is, therefore, *prima facie* correct.

Exceptions numbered 20 and 48 relate to a dividend of fifty-five per cent declared on the stock of the Central National Bank, and set apart as the distributive shares of the exceptors, amounting in the aggregate to $25,575.   The administrators collected this dividend from the bank about January 1, 1883.   Mrs. Ladd had no trustee, and her minor children no curators.   Afterwards Mr. Pigott was appointed her trustee and the probate court ordered the administrators to turn over her life estate therein to him, which the administrators did.   They likewise turned over the distributive shares

of her minor children to their curator, and made proper settlements with the probate court with respect to these matters. There is no room for criticism of the action of the administrators in this respect.

Exceptions 23 and 24 complained that personal property valued at $216,000 was distributed in kind by the administrators under the order of the probate court, without having commissioners appointed to put a valuation on it. It appears that each distributee received an equal amount of each class of stock distributed in kind, and it is not easy to discern wherein the exceptors have been injured. All of them have accepted the division and given acquittances to the administrators.

Exceptions 43, 44, 44½, 45, 50 and 54, refer to the distribution of the stock of the Boonville, St. Louis & Southern Railway Company. This stock was inventoried at $100 per share. It should have been inventoried at $125 per share. It consisted of 1,441 shares, which at $100 a share would amount to $144,100. It was divided in kind, and an equal amount in value distributed to each heir. Some were given 160 shares of the par value of $100, and some 128 shares of the par value of $125 each. All of it was distributed except one share, for which credit was taken by the administrators at their final settlement. It is admitted that the stock was, and is still, wholly worthless. No just cause of complaint can be predicated upon this transaction, and the exceptors show no injury to themselves, and no reason why the *prima facie* correctness of the transaction in the probate court should now be overcome.

Exception 47 relates to the dividend of surplus made by the Central National Bank. The same conditions present themselves with reference to this as were presented in regard to exceptions 20 and 48. The administrators have accounted for and turned over to Mr. Pigott, trustee for Mrs. Ladd, all of her interest in that matter.

Exception 57 relates to the payment to Lon V. Stephens, guardian of Alexander H. Stephens, of the sum of $700, made up of cash, $190, and overpayment to Alexander H. Stephens' former guardian, $510. As to this, the referee found that Alexander H. Stephens did not receive any more than his distributive share of the estate, all of which he has properly receipted for, either by his guardian, or by himself.

The 60th exception claims that two bonds for $2,000 were sold for $1,800, and that the bank account of the administrators shows they received $1,840 for them. It is true the bank account did show this, but it further shows that the $40 was an error, and was charged back by the bank to the administrators. The $200 difference between the par value of the bonds and what they sold for was properly allowed the administrators as a credit on final settlement, there being no evidence that they were sold for less than their market value.

This disposes of all of the specific objections raised to the final settlement of the administrators, except that it is claimed that some personal property in the room occupied by Miss Mittie Stephens was not inventoried. The testimony clearly shows that all of the property belonging to her father's estate had been removed from her room before the appraisers came to the house to appraise the property, and that there was nothing in her room except what belonged to her. Further, it is claimed that some personal property in a certain chest was taken away by some of the heirs. This chest is shown to have contained nothing except wearing apparel of deceased members of the family that had no market value. Other objections were raised as to other insignificant matters, but they were not sustained by any evidence in the case. After making all of these specific objections, the exceptors in the paper handed to the referee after the close of the trial, wound up in this manner: "Appellants ask the court to examine in open court and under oath, both of these administrators, touching these matters, and their various acts of mal-administration.

Ladd v. Stephens.

We ask the court to compel the administrators to appear at trial of this case in the circuit court of Howard county, Missouri, in November, 1894, and give a full personal explanation of all their dealings and transactions as administrators of the estate of Joseph L. Stephens, deceased, and to bring with them into open court the book of stock certificates of the Central National Bank of Boonville, Missouri, the book of certificates of stocks of the Boonville, St. Louis & Southern Railway Co., and the minute book of said corporation; and also a statement showing to whom the 400 bonds of $1,000 each of said corporation were issued and delivered, and to whom each of said bonds has since that time been transferred and delivered. Also the private account books, check books, with stubs, book showing list of bonds, stocks, notes, and other assets owned by said Joseph L. Stephens, at the time of his death," etc., etc.

It thus appears that the referee was not asked to take any steps with respect to these glittering generalities. When the case reached the circuit court, the exceptors did not ask the court to enforce the prayer of their petition, no steps were taken to cause the administrators to come into court and be examined again, nor were they required to make any disclosure of any matters thus vaguely alluded to. The circuit court was not given any information upon which to base any judgment that there were any bonds which had not been brought into the administration, nor was it supplied with any testimony or suggestion that there was anything else that the exceptors desired to be heard about. The cause proceeded to final judgment with the record an absolute blank with respect to these general charges and indefinite requests.

Now, however, in this court, page after page of printed matter has been filed, making serious and grave charges against the integrity of the administrators. It is so mixed with personalities, abuse and vituperation that it is impossible to determine whether the exceptors intend to charge the administrators with having misappropriated $133,000 or $333,000.

Stripped of the personalities, vituperation and abuse

which have been injected into the case by the exceptors' counsel, the facts in regard to this bond transaction are these: The Central National Bank owned 1,440 shares of stock of the Boonville, St. Louis and Southern Railway Company. J. L. Stephens owned 138 shares, and the remainder of the 2,000 shares were held by other persons. J. L. Stephens had built a railroad from Tipton to Versailles. On June 4, 1881, he made a written proposition to the stockholders of the Boonville, St. Louis and Southern Railway Co., who owned a railroad from Boonville to Tipton, to sell it the railroad owned by him, for $400,000 in first mortgage bonds, secured by a mortgage on both railroads, payable at thirty years, and further proposed: "Two hundred thousand dollars of which bonds I will exchange for $200,000 of the capital stock of this company" (B., St. L. & S. R'y Co.) "now outstanding, dollar for dollar." The company accepted the proposition. The deal was consummated. The $400,000 bonds were issued and delivered to Stephens on the 1st of August, 1881. On the 4th of August, 1881, the $400,000 bonds were distributed as follows:

| | |
|---|---:|
| J. L. Stephens | 67 bonds |
| Central National Bank | 66 bonds |
| Central National Bank | 144 bonds |
| Central National Bank | 50 bonds |
| J. M. Nelson | 8 bonds |
| H. Bunce | 5 bonds |
| Wm. Hanley | 5 bonds |
| C. W. & J. Sombart | 7 bonds |
| T. J. Portis | 2 bonds |
| T. J. Portis | 13 bonds |
| M. E. Pierce | 8 bonds |
| H. Dormitzer & Bunge | 5 bonds |
| G. R. Gage | 5 bonds |
| H .M. Bellamy | 5 bonds |
| L. V. Stephens | 3 bonds |
| Speed Stephens | 3 bonds |
| Draffen & Williams | 2 bonds |
| Total | 400 bonds |

The $200,000 of the stock of the railway company was turned over to J. L. Stephens, and were administered upon and distributed by the administrators.

It is apparent that the bonds were distributed among the stockholders of the Boonville, St. Louis & Southern Railway Co., in the proportion of their stock holdings in the railroad corporation. This left the original stockholders the bond-holders of the railroad company, and J. L. Stephens the owner of nearly the entire stock of the company. Exceptors can not understand how Mr. Stephens would exchange $200,000 of bonds for $200,000 of stock. The reason is plain. By this arrangement he would retain his share of the bonds, and when the bonds are paid would be the owner, substantially, of both roads. On the 11th of August, 1881, J. L. Stephens suddenly died. The administrators scheduled the stock and the $67,000 in bonds, and distributed them in kind, among the heirs, the exceptors getting their proper share, and the Central National Bank distributed the bonds so acquired by it, as dividends. The heirs of J. L. Stephens being owners of stock in the Central National Bank, shared in these dividends of this stock by the bank, and the exceptors have received some $40,000 to $45,000 as dividends by the bank in these same bonds.

Yet without a shadow of testimony, without any attempt to deny the receipt of their distributive share under the order of the probate court, while retaining the dividends received from the bank in the shape of this identical stock, after enjoying "the fruits of the tree" for over ten years without a word of complaint, and after all the evidence in the case was closed, and the judgment was rendered in the circuit court, and the case appealed, these exceptors, through their attorneys now assert in language personal and extremely intemperate, that the administrators have misappropriated $133,-000 and possibly $333,000 of these bonds. The only foundation for such serious charges is that the bonds were delivered

to J. L. Stephens on August 1st, 1881, and that he died ten days later. Upon this is predicated the argument that as the administrators only accounted for $67,000 of the bonds, they must have received the other $333,000 and converted them to their own use. This, too, when they know they have received their share of the $67,000 from the administrators, and also their proportionate share of the $262,000 of these bonds, which were distributed as dividends by the Central National Bank. There is not one particle of evidence that any more than $67,000 of these bonds ever came into the hands of the administrators, and these were honestly administered and distributed among all the heirs, including the exceptors. The fact that J. L. Stephens died ten days after receiving the bonds, would not, even if standing by itself, amount to any evidence that his administrators received them after his death, and this fact, taken in connection with the other facts disclosed by the record, would not rise to the dignity of proof of mal-administration in this case. Explained as it is by the admitted facts in this case, it is too clear for discussion that the charge is without foundation and ought never to have been made. An underlying error of exceptors runs through the whole case. They have proceeded upon the erroneous idea that because they have made grave and serious charges against these administrators, the burden of proof is upon them to exonerate themselves. This is not and never was the rule of the common law or of any English speaking people. It is the harsh rule that obtains in criminal cases in countries operating under the Napoleonic Code. The reverse is the rule which the wisdom of our ancestors adopted and transmitted to us. The burden of proof is upon him who brings the charge, to make out a *prima facie* case. The only exception to the rule, as it is applied to administrators, is that when they admit or it is shown they have received assets, they are bound to account for them or to produce them, and this is really more of a practical application of the rule than an exception to it.

The administration in this case was prompt, accurate, honest and faithful. It has been approved by the probate court of Cooper county, by the referee and the circuit court of Howard county, after full inquiry and searching trial. It has been carefully scrutinized by this court and every charge and fact asserted or proved has been fully weighed, without stopping to inquire as to how or when it got into the case, and the conclusion is irresistible that the judgment of the circuit court is right, and should be affirmed.

GANTT, C. J., SHERWOOD, BURGESS, ROBINSON and BRACE, JJ., concur. WILLIAMS, J., having been of counsel in the case, did not sit and took no part herein.