[No. 15374.   Department Two.   March 22, 1920.]

## In the Matter of the Estate of SCOTT McDONALD.
## F. D. ALLEN, *Executor, Appellant,* v. RUTH McDONALD *et al., Respondents.*[1]

WILLS (74)—CONSTRUCTION—POWER TO REINVEST FUNDS.  Under a will directing that certain securities be sold and the proceeds invested in government bonds, which was done, the executors may sell the bonds purchased and reinvest in like government bonds.

SAME (74).  A provision in a will directing that bonds purchased shall be kept in a responsible bank and may be sold for the purposes of paying legacies, does not prevent their sale and reinvestment in like bonds to better the income.

EXECUTORS AND ADMINISTRATORS (43) — INVESTMENTS — LOSS. Legatees under a will who objected to the consummation of an investment in bonds and preferred that the executors forfeit a deposit thereon, cannot hold an executor personally liable for the deposit on the ground that they failed to obtain permission of the court to make the investment, where there would have been no loss if the investment had been consummated, as such executor proposed and wished to do.

SAME (47)—CO-EXECUTORS—JOINT OR SEVERAL AUTHORITY—ACQUI-ESCENCE IN ACTS.  Where two resident executors were actively performing all the duties connected with the office, with the acquiescence of all in interest, complaint cannot be made of their investment of funds without the cooperation of two nonresident executors.

SAME (165)—RIGHT TO COMPENSATION—PARTIAL ALLOWANCE BE-FORE FINAL SETTLEMENT.  The court has power, during the course of administration, to permit an executor to receive a portion of his commissions or compensation; and where executors of an estate that would not be settled for many years have paid themselves reasonable annual compensation for services rendered, the court, upon objection, should approve the payments, although made without previous order by the court.

Appeal from a judgment of the superior court for Spokane county, Oswald, J., entered February 3, 1919, upon findings in favor of heirs, upon objections to the

[1]Reported in 188 Pac. 523.

annual account of executors, after a hearing before the court. Affirmed in part and reversed in part.

*Alex M. Winston,* for appellant.

*Henry L. Kennan,* for respondents.

Bridges, J. — More than sixteen years ago, Scott McDonald, a resident of the city of Spokane, died testate, leaving a large estate. After making provision for his widow and certain other persons, his will gave to his daughter Ruth $100,000, and to his son Bruce $100,000, and in addition thereto he gave them any sums which might be left after paying the other bequests. Provision was made for the conversion of the property into money. The will directed that the money bequeathed to his daughter Ruth should be, by his executors, placed and kept in the savings department of the Bank of Montreal, at Nelson, B. C., until she attained the age of twenty-five years, at which time a certain portion of such bequest should be paid to her. When she arrived at the age of thirty, another portion was to be paid, and the balance was to be paid when she was forty years of age. In the event of her death, the money was to be paid to her children at designated times. Similar provisions were made with reference to the legacy to his son. The will directed that these sums of money should remain on deposit in the Bank of Montreal, there to draw such rate of interest as could be obtained, until the coming about of certain contingencies (which did later occur), at which time the executors should,

"Withdraw said moneys from the said bank and invest the same in bonds of the government of the United States, and I hereby empower said executors to sell so many of said bonds from time to time as may be necessary to pay said legacies as they become due . . ."

Four persons were appointed executors of the will, and provision was made for filling any vacancy which might occur. The widow was made one of the executors, and she was expressly relieved from giving any bonds. The duties imposed upon the executors might continue for fifty years or more, and in any and all events, they would necessarily continue for a great many years. At the time of the death of the testator, both of his children were minors, but at the time of the controversy in question, each was of lawful age. During the period covering the transactions complained of, the four executors were Agnes McDonald, the widow, and F. D. Allen, both residents of Spokane, Glenroy McDonald, a brother, residing at Wallace, Idaho, and F. M. March, a resident in an eastern state. During recent years, Mrs. McDonald and Allen have been the active executors and performed nearly all of the duties imposed by the will, which facts were known to and acquiesced in by the legatees.

In June, 1917, certain contingencies arose, which, under the terms of the will, authorized the executors to, and they did, withdraw $325,000 from the Bank of Montreal and they invested the whole of that sum in the three and one-half per cent liberty bonds of the United States Government, which, at that time were being offered for sale by the Government. On and prior to October 27, 1917, the Government was offering for sale its four per cent liberty bonds, and the question arose between the two resident executors whether they should sell their three and one-half per cent and buy an equal amount of the four per cent bonds. They discussed this question on a number of occasions and obtained the advice thereon of a number of the best financiers in Spokane. All, or nearly all of these financiers, advised that it would be to the material advantage of the estate to sell the three and

one-half per cent bonds and purchase the four per cent bonds. The two resident executors, being of the same opinion, on the date above mentioned, subscribed for $325,000 of the four per cent bonds. They expected to raise the necessary money by selling the three and one-half per cent bonds, which could at that time be sold for par or better. One of the banks of Spokane advanced the executors $6,500, without interest, to make the first payment of two per cent. It was expected that, before the second installment came due, they would have received and sold at par, or better, the three and one-half per cent bonds, and thus have raised money sufficient to completely pay for the new bonds, and also discharge the obligation of the bank in the sum of $6,500. There is no dispute but what the executors acted in the utmost good faith in subscribing for the four per cent bonds, and that they so did because they were convinced it was for the best interest of the estate. There is a dispute in the testimony whether Bruce and Ruth McDonald knew that the subscription was to be made. At any event, on the day following the subscription, they learned what had been done and on that day there was a conference between Mrs. McDonald and themselves, when they determined that they were opposed to the purchase of the new bonds. At this conference, it was also agreed that they would confer with Glenroy McDonald, one of the executors, with a view to annulling the proposed purchase. Allen did not receive information that the McDonalds were dissatisfied with the proposed purchase for some ten days thereafter. On the 15th of November, a meeting of the parties interested was held, at which were Allen, Glenroy McDonald, Mrs. McDonald, and Ruth and Bruce McDonald. At this meeting, all of the parties present, except Allen, expressed a desire and determination

not to consummate the purchase of the four per cent
bonds, and stated that they were willing that the $6,500
which had been paid thereon should be forfeited.
Allen protested. As the result of this conference, the
proposed deal fell through. Meanwhile, however, the
Government had refused to honor the subscription in
the full amount of $325,000, or in any other sum in
excess of $267,500, so that the forfeiture of the two
per cent instead of being $6,500 was $5,350, which
represented a total loss.

Prior to this time, the executors had annually made
an accounting of their trust to the probate court of
Spokane county. It had been their custom, previous
to making their reports, to pay themselves on account
of services the sum of $1,000 per annum and ask ap-
proval thereof, and at all previous times the court had
approved such payments. The executors neglected,
however, to make any report during the year 1916,
but, at the end of the year 1917, they filed a report of
their transaction for the years 1916 and 1917. In this
report, they gave a history of the proposed purchase
of the four per cent bonds, and the resultant loss of
$5,350. They also reported that they had paid them-
selves on account of compensation for the year 1916
the sum of $1,000, and a like sum for the year 1917,
of which amounts Allen had received $876.40. Upon
the filing of this report, Bruce and Ruth McDonald
made written objections to certain parts thereof, and
particularly objected to their estate being charged with
the loss of $5,350 on account of the four per cent bonds,
and asked that the executors be required to stand that
loss and that the amount be charged against them.
They also objected to the executors paying to them-
selves $2,000 on account of services for the years 1916
and 1917, and asked that they be required to pay that
sum back into the estate. The trial court, after find-

ing the facts substantially as we have set them out, adjudged that the item of $2,000 paid on account of compensation for the years 1916 and 1917 should be disallowed, and that each executor should pay to the estate the amount he or she had received, and also that Allen and Mrs. McDonald should stand the loss of the $5,350 on account of the bond transaction, each being liable for one-half of that amount. From this judgment, Allen has appealed.

The trial court seems to have required the two resident executors to personally stand the loss on account of the failure to consummate the purchase of the four per cent bonds, upon the theory that, in subscribing for such bonds and paying the first two per cent of the purchase price, they were acting without authority either of the court or by the terms of the will. It seems to be contended by the respondents that, when the executors had once withdrawn the money from the Bank of Montreal and purchased the three and one-half per cent bonds, the power of investment given by the will had been exhausted; that the power to invest does not include the power to reinvest unless the same be given by the express terms of the will or by necessary implication. We feel confident that the true path of construction will lead us to exactly the reverse conclusion reached by respondents; in other words, that the power to invest includes the power to reinvest, unless by express terms or necessary implication that power be denied. The will expressly provides that the money shall be invested, if taken out of the Bank of Montreal, in bonds or securities of the United States Government. Under the authorities and under the ordinary rules of common sense, the executors would be limited in their investments to the kind of property provided for in the will or other trust instrument. If a will provides that money shall be invested in Gov-

ernment securities, the executors would not have authority to invest in railroad or bank stocks and would become personally liable for any resultant loss. If a will provides that money in the hands of the executors shall be loaned only on real estate securities, the executors would have no power to buy government bonds or make any other kind of investment or to loan the money on any securities other than real estate, and for breach of their trust the executors would be liable for any loss. But we have not those questions to deal with here. The will provides for investment in the bonds or securities of the United States Government, and the investment here in dispute is in the very securities permitted by that instrument. In construing a will, the court should always try to determine what the testator intended; to put itself, as nearly as possible, in his place when he was making the will; to apply the ordinary rules governing business. In the language of the business man, the power to purchase bonds means the power to purchase and repurchase; the power to invest means the power to invest and reinvest. It must be assumed that the testator wished his estate to increase in value, in so far as that could be accomplished by making purchases of United States Government bonds. It must be presumed that, were the testator alive, he would consider it good business to sell bonds which he had in order to purchase like bonds, drawing a greater rate of interest. We ought not to presume that the testator meant to deprive his executors of the power of doing that which he would have done, unless the language of his will, either expressly or by implication, deprives them of that power. What valid argument can be made in favor of the limited construction? The only ground given by respondent is that to reinvest in Government bonds would be speculating. The investment in the four per

cent bonds would not be any more of a speculation than the authorized investment in the three and one-half per cent bonds.

The powers of the executors should be commensurate with the purposes of the trust. Since the testator authorized his executors to invest in United States Government bonds, it would seem unreasonable, unjust, and in violation of the ordinary rules of construction and business, to hold that he meant to forbid them selling one Government bond and buying another which would bring in to the estate a greater revenue. Suppose the war had continued till the Government was issuing its bonds bearing six per cent interest, would any one doubt the advisability or power of the executors to sell the three per cent bonds and purchase the six per cent? Indeed, might not the executors be personally held for not making the change. Shortly after these four per cent bonds were sold, the Government authorized the conversion of the three and one-half per cent bonds into the four per cent. Certainly it would not be seriously argued that the executors could not lawfully make the conversion. And yet there is no legal difference between converting the one bond into the other and selling the one and buying the other with the same money.

But respondents contend that, inasmuch as the testator provided in his will that the bonds should be kept on deposit in some responsible bank, and that the executors might sell them from time to time for the purpose of paying the legacies, he has, therefore, impliedly, at any rate, forbidden any sale of the bonds for the purpose of repurchasing similar bonds. We cannot so construe the will. The testator, by this provision, intended merely to provide a way whereby the executors might find the money to pay the legacies when they became payable.

It seems rather strange that this particular question has not more often arisen in, and been discussed by, the courts. The briefs of counsel do not cite a single authority, with the possible exception of one, which appears to be directly in point, nor has our research rewarded us with any authoritative decision. The following cases support, to a greater or less extent, the views expressed by us: *Luxon v. Wilgus,* 70 Ky. 205; *Citizens' Nat. Bank v. Jefferson,* 88. Ky. 651, 11 S. W. 767; *Gray v. Lynch,* 8 Gill (Md.), 319; *Gamble v. Gibson,* 59 Mo. 585; *Richardson v. Knight,* 69 Me. 285. Most of the cases cited by respondents to this point are to the effect that, where a will or other trust instrument provides that the trustees shall invest only in a certain designated class of securities, the trustees have no power to invest in any other class and that they will be liable, personally, for any resultant loss.

In the case of *Nyce's Estate,* 5 Watts & Serg. (Pa.) 254, 40 Am. Dec. 498, the will provided that moneys on hand should be put out at interest provided the loans were well secured. The executors invested in bank stock and it was held that they were liable for the loss which resulted. In the case of *Pitts v. Singleton,* 44 Ala. 363, it was held that a trustee could not change the property of the estate received by him into other funds without authority of law. In the case of *Kaufman v. Crawford,* 9 Watts & Serg. (Pa.) 131, 42 Am. Dec. 323, it was held that a trustee not specially authorized could not make changes of money into land or land into money. In the case of *Quick v. Fisher,* 9 N. J. Eq. 801, it was held that a trustee has no power to change the character of the trust funds, and if he converts real estate into personalty and personalty into realty, he acts at his peril. Most of the other cases cited by respondents are of like character and do not decide the question under discussion.

The case of *Branch v. De Wolf,* 28 R. I. 542, 68 Atl. 543, is apparently, to some extent, against the doctrine we have announced. The opinion is short, and the question apparently not well considered; no authorities are cited or attempted to be cited in support of the views expressed. If that case be construed as opposed to the view which we have expressed, we elect not to follow it.

We have no hesitation, therefore, in coming to the conclusion that there was nothing in the will which deprived the executors in this case of the power to sell their three and one-half per cent bonds and invest in the four per cent bonds.

It is contended, however, by the respondents that, even if the will gives authority to the executors to invest in the four per cent bonds, yet the judgment must be sustained because it was the duty of the executors, before making any investment, to obtain the permission of the court to so do. This argument might be of some weight if Allen had been responsible for the loss of the $5,350. The testimony shows quite conclusively that, had the executors carried out their program to invest in the four per cent bonds, there would not have been any loss for any one to bear. The appellant insisted on completing the program of purchase, but two of the other executors, with the full consent of the legatees Bruce and Ruth McDonald, determined to refuse to consummate the deal and expressly stated that, rather than do so, they would forfeit the two per cent first payment of $5,350. This loss, then, was caused directly by the very persons who are now seeking to require the executor Allen to shoulder it. Since, therefore, the appellant was not responsible for the loss, he ought not to be required to bear the burden of it, but it should be borne by the legatees who were responsible for it. Viewing the

matter from this standpoint, it is plain that the respondents are in no position to complain that the executors failed to obtain the permission of the court to make this investment.

It is also claimed by respondents that the executors should bear this loss because less than a majority of them made the investment without the knowledge or consent of the others. But the respondents are in no position to raise this question. They have known for years past that the two resident executors were actively performing practically all of the duties imposed by the will, and they at all times acquiesced therein and accepted the benefits derived therefrom. It would not be fair, therefore, to those executors who were performing their duties to permit the respondents to complain because they had not worked in conjunction with their co-executors. This conclusion makes it unnecessary for us to decide whether or not, under the circumstances of this case, less than the whole number of executors would be authorized, legally, to carry on the business of the estate.

The trial court adjudged that executor Allen should pay back to the estate $876.40, being the amount received by him out of the $2,000 which the executors had paid to themselves on account of compensation for the years of 1916 and 1917. It appears to be conceded that the various amounts which the executors have received as commissions aggregate $23,000, and that the commissions earned to date amount to $27,000. Respondents contend that an executor or administrator is not entitled to any portion of his commissions or compensation until the final accounting and settlement of the estate. Some courts, including this one, have held that an executor or administrator cannot, during the course of administration, pay over to himself any part of his commission or compensation. *Hagerty v.*

*Work,* 97 Wash. 491, 166 Pac. 1139. But it has not been held that, during the course of administration, the court may not, in the exercise of its discretion, permit the executor or administrator to receive a portion of the commission or compensation. On the contrary, it has generally been held that such power rests in the court. *Collins v. Tilton,* 58 Ind. 374; *In re Ricker's Estate,* 14 Mont. 153, 35 Pac. 960, 29 L. R. A. 622; *In re Selleck,* 111 N. Y. 284, 19 N. E. 66; *Stewart's Appeal,* 110 Pa. St. 410, 6 Atl. 321; *In re Stratton's Estate,* 46 Md. 551; *Ladd v. Stephens,* 147 Mo. 319, 48 S. W. 915. Neither the old nor the new probate code, expressly or by implication, negatives this power. We do not see any sound reason why the court, in its discretion, should not have that authority, nor is there any likelihood that the estate will suffer by its exercise. On the contrary, in many instances, definite benefit will result. It is asserted that this estate may not be closed for fifty years or more from the time of the death of the testator; in any event, it is not likely to be closed for a good many years. Manifestly, the executors cannot wait all those years before receiving any pay, and to refuse to periodically compensate them would be tantamount to requiring their resignations. When an estate may be settled in the usual time, the court will and should be slow to allow any portion of the executor's or administrator's compensation to be paid before the settlement of the final account. And if, in any instance, the court shall refuse to approve any previous payments so made, the judgment should require that the money, with interest, be paid back to the estate. But that the power to direct payment to be made is vested in the court, we have no doubt. The power to authorize the payment includes the power to approve any payment previously made. In the instant

case, we think the trial court should have approved the payment made by the executors to themselves.

The conclusion to which we have come on this branch of the case is not out of harmony with the case of *Hagerty v. Work, supra.* The court in that case went no further than to hold that an executor or administrator has no authority to pay to himself, without the previous order of the court, any portion of his compensation prior to the settlement of his final account. For the court there said:

"Whether this court has the power under any circumstances to award compensation to the executor prior to the settlement of the final account, we do not here determine, as that question is not involved in this appeal. The question here is whether the executors had the right to pay themselves on account of compensation or commission prior to the time of the final settlement."

We decide that the court erred in charging appellant with one-half or any portion of the loss on account of the Government bond purchase, and $4.05 on account of a telegram sent in an effort to cancel the subscription, and in charging to him the sum of $876.40 paid to him on account of commission or compensation for the years 1916 and 1917, and in adjudging that he be required to pay said sums, together with interest, to the estate. In these respects the judgment is reversed; in all other things it is affirmed. The case is remanded with instructions to proceed in accordance herewith.

Holcomb, C. J., Tolman, Fullerton, and Mount, JJ., concur.