G. W. BLUM, ADMINISTRATOR DE BONIS NON CUM TESTAMENTO ANNEXO OF THE ESTATE OF TALLEYRAND C. FROST, DECEASED, RESPONDENT, v. UNICEY J. FROST AND JOE FROST, APPELLANTS.— 116 S. W. (2d) 541.

St. Louis Court of Appeals. Opinion filed May 3, 1938.

Motion for Rehearing Overruled May 18, 1938.

*G. R. Breidenstein* and *James H. Talbott* for respondent.

*Rendlen, White & Rendlen* for respondent.

HOSTETTER, P. J.—This suit was begun in the circuit court of Clark County, Missouri, on the 20th day of February, 1936, by Amy Frost as executrix of the will of Talleyrand C. Frost, deceased, plaintiff, by the filing of her petition, wherein Unicey J. Frost and Joe Frost, widow and son of the testator, and Maudeline Frost, wife of Joe Frost, were defendants.

The averments of the petition are as follows: That Talleyrand C. Frost of Clark County, Missouri, died testate on June 30, 1935. His will was duly admitted to probate July 5, 1935, and his executrix, Amy Frost, qualified as such and is duly acting. At his death testator owned a certain farm in Clark County, Missouri, known as "Cal Frost Farm," which had a corn crop thereon, the sole property of testator. That plaintiff executrix, on July 5, 1935, upon her then appointment as executrix, was entitled to immediate possession of said corn and now is so entitled. That as executrix plaintiff was in possession of said corn from July 5, 1935, until about November 1, 1935, at which latter time defendants entered on the land and unlawfully took into their possession 2000 bushels of said corn of the value of $1500, which defendants converted to their use to plaintiff's damage in the sum of $1500 for which, with $200 damages for unlawful detention, plaintiff asks judgment with costs.

The averments of the amended answer are as follows: Defendants admitted death of testator, that his will was duly admitted to probate, the grant of letters testamentary to plaintiff who duly qualified and is so acting, and that testator owned the lands described as such matters were averred in the petition. Other allegations of petition denied. Answer then averred that testator gave all his real estate to his wife, the defendant, Unicey J. Frost, for life, with all crops, income and profits therefrom. That the crops of grain sued for were crops and income from said lands of testator, all maturing, harvested, severed and gathered after testator's death, in which plaintiff had no right, interest or title. It was further averred that said farm was a part of and used by testator in connection with his home and mansion house, and was a part of and used as a messuage or plantation, connected with and belonging to testator's mansion house. That defendant, Unicey J. Frost, was the wife and is now the widow of testator and at his death was residing in and enjoying such mansion house and the aforesaid plantation and messuages belonging to said mansion house; that defendant widow had the right of quarantine in her said home and said lands used in connection therewith, and the rents,

profits and crops arising therefrom until dower was assigned to her as such widow; that dower has never been so assigned said widow and she had the right of quarantine and possession from her husband's death until and at and after plaintiff filed this action. That said widow, defendant Unicey Frost, at all times herein had all the rights of a widow in the personal and real estate of her deceased husband which she asserts and claims. That defendant, Joe Frost, is and was the duly adopted son of testator and his wife, Unicey J. Frost, and is testator's sole and only heir. Defendant Maudeline Frost is the wife of said Joe Frost.

The reply was in substance as follows: Denial of amended answer insofar as same controverts plaintiff's petition. Denied farm in question was part of or used as messuage or plantation connected with mansion house of testator, and averred same was not connected at all. Denied the widow had any right to corn crop after her husband's death and denied she had any quarantine in said lands. That defendant widow, at time of testator's death, lived with him in Wayland, Clark County, Missouri, eight miles from farm in question. That testator owned a house and farm buildings in the village of St. Francisville, Clark County, Missouri, which, with farm lands in question, constituted one unit and were used together. Averred that on July 11, 1935, the defendant widow duly filed and renounced the will of her deceased husband and refused to accept the provisions thereof. Denied Joe Frost is or was adopted son of testator.

The will of Talleyrand C. Frost, which was executed on June 14, 1933, caption, signatures and attestation clause omitted, is as follows:

"Article 1. I direct the payment of all of my just debts and funeral expenses.

"Article 2. I give and bequeath to my adopted son, Joseph Frost, the sum of One dollar.

"Article 3. I give and bequeath to my sisters and their heirs Lot No. 3 block No. six (6) McDermott's 2nd Addition to Wayland, Clark County, Missouri, to have and to hold forever.

"Article 4. I give and bequeath to my wife, Unicey J. Frost, the life use and income from all of the real estate that I may own and be possessed of at the time of my death, excepting as is provided in Article 3, and also the net income from all sums of money that I may have at the time of my death or other securities; said moneys to be invested by my executrix and the net income arising therefrom to be paid semi-annually to my said wife. All other personal property that I may be possessed of to vest in my said wife in fee.

"Article 5. I give and bequeath to my sisters, Sally O. Miller, Loma Wolf, Amy Frost and the heirs of Lucy Wolf, all of my real estate and moneys mentioned in Article 4, subject to the provisions of Articles 2, 3 and 4, of this my last will and testament, one fourth to Sally O. Miller; one-fourth to Loma Wolf, one-fourth to Amy Frost,

and one-fourth to the heirs of my deceased sister, Lucy L. Wolf, at the death of my said wife Unicey J. Frost.

"I hereby nominate and appoint Amy Frost executrix and request that she be not required to give a bond."

The case was tried on September 2, 1936, and by mutual consent of the parties a jury was waived and the case was tried by the court, and, upon the request of defendants, under the provisions of Section 952, Revised Statutes Missouri, 1929 (Mo. Stat. Ann., sec. 952, p. 1225), the court, after holding the case under advisement until September 28, 1936, made, and stated in writing its conclusions of facts found separately from the conclusions of law, as follows:

"THE FACTS.

"For many years next prior to his death decedent owned the farm in question, located in the general neighborhood of St. Francisville, in Clark County, Missouri. There were no buildings of any importance on the land. Decedent owned a residence property in the town of St. Francisville, referred to in the evidence as the 'Big House.' Here, for many years, decedent lived with his family while he operated the farm. In the barns of this property were housed the work stock, tools, equipment, and feed used in connection with the farming of the land. The men employed to work on the farm boarded at the 'big house.' It was, in fact, the mansion house, used in connection with the farm land, and was an integral part of the farming unit.

"For some time prior to his death, decedent had owned and was living with his wife in a small residence property in the town of Wayland, Missouri. Thither he had moved from his home in St. Francisville and here he resided until his death. This was a small property with no barns or outbuildings and, so far as the evidence shows, was not an integral part of the farming unit. None of the stock, tools, or equipment used in the farming operation were ever here; just he and his wife resided here. The son, with his family, resided in the 'big house' at St. Francisville, and the son carried on the farming operations after the decedent moved to Wayland. The son owned part of the equipment used, and he continued to use the work stock and a part, at least, if not all, of the equipment of the father. The farm produced the sole income the decedent had and he made frequent visits to the farm. Decedent was 81 years old at the time of his death which is convincing evidence of the fact that he no longer operated the farm, personally. True, he paid some of the 'hired help,' but the extent and the arrangements under which this was done and why it was done is left to conjecture.

"Decedent died June 30th, 1935, while living at Wayland. On July 5th, 1935, plaintiff was qualified as executrix under the will. The defendant, Unicey J. Frost, duly renounced the provisions of the will and her election to take a child's share in her husband's estate was duly filed in April, 1936. No dower has been assigned to her.

"The crop of corn in controversy was growing on decedent's land at the time of his death. It was cultivated and gathered by defendant Joe Frost, assisted by men employed by him and by his mother. That these two defendants received and retained the proceeds of the corn sold and that Joe Frost used for his own benefit the corn that was not sold, is not disputed. There is nothing to connect defendant Maudeline Frost with the conversion of the corn. Just why she is joined as a defendant is not clear.

"From the cross-examination of Joe Frost it appears that 2370 bushels of corn were gathered from this land in the fall of 1935. It was worth, at Kahoka, at gathering time, 55c to 60c per bushel; it was worth 5c per bushel to haul it to market. While there is not proof on the subject, the court will indulge the suggestion that it was worth 5c per bushel to gather it. Striking an average—and there is little else the court can do—this makes the value of the crop, at gathering time, worth $1117, standing in the field.

"It seems clear that the act of conversion was at the time of the gathering of the crop and not at the date the executrix qualified. The defendants testified that they knew the executrix claimed the corn; took legal advice on the proposition; but they did nothing toward taking it into possession until they gathered the crop. That is the sole act of conversion in the case. Because of their apparent belief that they were acting within their rights, it seems only fair that they should be allowed the expense of gathering and marketing the crop.

"THE LAW.

"The Court feels compelled to follow the case of Whalen v. Whalen, 51 Mo. 36. This case is cited only once: Morris v. Thomas, 51 Mo. 159.

"While this case is old, still the court feels bound to follow it in view of the fact that it has never been overruled or criticised. The several cases cited by defendants do not, in any wise, conflict with it. They, in fact, but amplify upon the wording of the statute which creates quarantine. Quarantine is not a title—it is but a right. A right to occupy the mansion house and homestead until dower is assigned and collect and retain the rents and profits therefrom during said period. We are not concerned with rents and profits; this case deals solely with implements and as to who is the owner thereof upon the death of the landowner. The Whalen case decides that point definitely, and trial courts must follow the Supreme Court, else endless confusion will ensue.

"The Court does not think that the right of Quarantine extends to the land involved in this controversy. It seems clear that the residence in Wayland was not the mansion house used in connection with the farming land. The St. Francisville house is evidently the mansion house. In this connection the case of Farmers State Bank v. Welch (Texas), 279 S. W. 481, is persuasive."

A judgment was thereupon rendered by the court in favor of plaintiff executrix and against defendants Unicey J. Frost and Joe Frost for $11.17 with interest thereon from December 1, 1935, at the rate of six per cent per annum and costs, and discharging defendant Maudeline Frost.

At the time of the submission of the case, on September 2, 1936, defendants offered a number of instructions in respect to the facts and the law, most of which were refused, and, in defendants' motion for a new trial, the correctness of the court's written findings of facts was challenged on the grounds that there was no evidence to support certain findings of fact by the court and that the findings of fact did not include all the issues and did not fairly state the facts.

Thereupon, after defendants' said motion for a new trial had been overruled, the widow and her son, Joe Frost, bring the cause by appeal to this court for review.

After the appeal was lodged in this court, Amy Frost, the executrix, died, on March 29, 1937, and, in accord with the stipulation of counsel, G. W. Blum, administrator *de bonis non cum testamento annexo* of the estate of Talleyrand C. Frost, deceased, was substituted for said original plaintiff.

Ordinarily, the finding of facts under the provisions of Section 952, Revised Statutes Missouri, 1929 (Mo. Stat. Ann., sec. 952, p. 1225), amounts to a special verdict and is usually conclusive on the parties, but in the instant case the finding of facts as made by the trial court is properly open for assault in the appellate court. [Freeman v. Hemenway, 75 Mo. App. 611, 617, 621; Pemiscot County Bank v. Tower Grove Bank, 204 Mo. App. 441, l. c. 464, 465, 223 S. W. 115.]

It will be noted that in the plaintiff's petition she alleges that she was in possession of said corn from July 5, 1935, until November 1, 1935, and that at the latter date the defendants entered on the land and took possession of the corn and converted it to their own use. There is no evidence whatever to support this allegation of the petition. Plaintiff herself did not testify. All the testimony given in the case was uniformly to the effect that after the death of the testator, which was on June 30, 1935, Joe Frost and his mother, Unicey J. Frost, were in possession of the unmatured crop and continued in possession of it, cultivating the crop until it was "laid by," and paying the necessary expenses for the cultivation of same, and also, after the corn had fully matured and was ready to be gathered and they gathered it and sold a large portion of it and the remainder was used by Joe Frost by being fed to the live stock.. There is no showing whatever that the plaintiff executrix ever made any demand on the defendants to deliver up the crop of corn to her, except a demand by the filing of this suit, which was not instituted until February 20, 1936.

It is the contention of the defendants that if there ever was a conversion of the corn by the widow and son of the testator it was at the time the plaintiff executrix was qualified as such on July 5, 1935, and that if any right of recovery existed in the executrix it should be based on the value of the unmatured crop at that time. Inasmuch as there was no testimony given on behalf of plaintiff as to the value of the growing crop of corn at the time of her appointment as executrix under the order of the probate court, therefore, there should be no recovery of damages, or, if recovery of damages was proper, it would have to be based on the actual value of the growing crop at the time of such qualification as executrix on July 5, 1935.

The widow testified as follows: "Joe Frost is our adopted son. On the death of my husband, I claimed and took charge of the crop of corn and claimed it as my own. The executrix said nothing to me. I did not, at any time, recognize any rights of the executrix in that corn. I and my son Joe, after my husband's death, paid all expenses of raising and gathering the corn; we got along the best we could—we had to borrow money to go on. I never saw the executrix to speak to her; she never came near me. I was never notified of any claim of the executrix to the corn. I told Joe to go on the farm. The executrix never spoke to me. . . . My lawyer told me that corn was mine and to get the money for it. I went according to my lawyer's direction, thought the corn was mine."

Joe Frost testified as follows: "My name is Joe Frost. I was taken by Unicey and Talleyrand Frost when I was six years old. I am the adopted child named in the deed of adoption, Exhibit 7. I was the orphan named in the deed of adoption, and brought to the home of Unicey and Talleyrand Frost in Clark County, Missouri. In 1935 had 85 acres of corn planted. Some had to be replanted, because it was drowned out. Neither the executrix, nor anyone representing her, came out or did anything toward the crop in any way, shape or form. After my father's death, my mother, Unicey J. Frost, paid the bills for carrying on the crop, cultivating and harvesting it. In June and July, 1935, half the corn was plowed twice and half of it once. My mother made claim to the crop at the death of my father, and continued so up until and after harvest. All expenses were paid by my mother. My mother paid on the crop before father's death; the house at St. Francisville where I lived belonged to her. The executrix never did tell me to go on the place and tend the corn after Cal's (testator's) death. I disposed of that corn and handed the money I got for it to my mother. She told me to go on the place and harvest the corn and to sell it, and I sold it because of her telling me that. Never consulted executrix. I own tractor and equipment used in this crop."

The deed of adoption shows that Joe Frost was duly adopted as the son of the testator and his wife from the Missouri Baptist Orphanage when Joe was a small boy.

We think that the trial court erred in its findings of facts to the effect that the alleged conversion took place about December 1, 1935, after the maturity of the corn and the gathering of it. It does not appear by the testimony that the plaintiff executrix was ever on the premises where the corn was growing, either in person or by an agent, from the time of the death of the testator until after the corn had been gathered and disposed of in the latter part of the year 1935.

In 65 C. J., p. 11, sec. 1; p. 29, sec. 37; p. 31, sec. 37, conversion is defined as follows:

"An unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights. The legal wrong denominated 'conversion' is any unauthorized act of dominion or ownership exercised by one person over personal property belonging to another in denial of, or inconsistent with, his right."

In Wilkinson v. Misner, 158 Mo. App. 551, l. c. 555, 138 S. W. 931, appears the following pronouncement:

"Any wrongful exercise of dominion by one person over the goods and chattels of another, which is inconsistent with and exclusive of the owner's rights therein, amount to a conversion thereof."

65 C. J., p. 27, sec. 29, states:

"In jurisdictions where crops are considered personal property, severance or removal of growing crops is not necessary to constitute a conversion, but it will be sufficient that defendant exercise some act of dominion over the property."

65 C. J., p. 31, sec. 38, states:

"Regardless of whether he came into possession of the property lawfully or unlawfully, a person in possession of personal property of another is guilty of conversion when he makes an unfounded claim or assertion of ownership or title thereto."

From the time of the testator's death the widow was in sole and exclusive control of the growing crop and paid all the expenses in raising and gathering the crop and sold the crop and at all times held herself out as the owner and continued to do so until after the crop was gathered and either used up or sold. It appeared in evidence that considerable work and expense was incurred in the planting and replanting of the crop of corn in controversy. It appeared that a portion of the acreage became overflowed and that portion of the crop which was drowned out, had to be replanted. It does not appear definitely when the crop was planted, except that one of the witnesses testified that it was planted in April, and, no definite time was fixed when the replanting occurred. There was a slogan of the early pioneers who settled in the wooded areas of northeast Missouri,

to the effect that "when the hickory buds get as big as squirrel ears then is the time to plant corn," and this saying has been handed down to the present generation, and, inasmuch as the place where this eighty-five acre crop was located is in the extreme northern part of Missouri, adjacent to the Iowa line, the planting and replanting might extend into the latter part of June or the first part of July. The common usage was, that it was necessary to plow over a growing crop of corn at least four times before it was ready to be "laid by." So that, the expense of completing the work necessary to bring the crop to maturity was substantial. The executrix, of course, was certainly in a position to know that the widow and her son were taking care of this growing crop of corn, replanting and cultivating it, and being out considerable expense in bringing it to maturity and in gathering it. It strikes one, as being very unfair and unjust that the executrix, claiming that she is entitled to the crop, would remain inert, and see the widow and her son Joe, bear the substantial expense that was necessary to cultivate the crop and gather it, without saying anything to them and without warning them that they were trespassing on her property. She sought to reap where she had not sown. It would be very inequitable and unjust to allow her to have the benefit of their labor and their expenses under those circumstances, assuming that she had a legal right to appropriate the crop as properly belonging to the estate.

A spirited discussion appears in respect to what were the widow's rights in respect to quarantine. The trial court based its ruling that the widow was not entitled to her quarantine rights prior to the assignment of dower, on the fact that she did not occupy the mansion house a the time of the death of the testator but lived at Wayland, a village some six miles distant from the land in controversy.

There is no question but that the case of Whalen v. Whalen, 51 Mo. 36, relied on by the trial court in denying that the widow had any right of quarantine, does support its position in that respect. However, it is contended by counsel for the defendants that this case is not the law of Missouri today, although it has never been formally repudiated, and that it has only been cited once, and then in Morris v. Thomas, 51 Mo. 159. It is also pointed out by counsel for defendants that the Morris case was written by the same judge who wrote the opinion in the Whalen case.

It is further urged by counsel for the defendants that the reasoning in the case of Gentry v. Gentry, 122 Mo. 202, 26 S. W. 1090, and other cases of modern vintage, are diametrically opposed to the reasoning employed in the Whalen case, which is illiberal, sour, ultra technical and unsound.

There is much force in this contention of defendants' counsel. An excerpt from Gentry v. Gentry, *supra*, will serve to emphasize the vast difference between it and the Whalen case, *supra*, viz:

"A right of quarantine is not confined to contiguous lands; the plantation lands on which it attaches itself, may be segregated; they need not be *en bloc*. In Perkins v. Quigley, 62 Mo. 498, it was ruled that in homestead lands contiguity was not an essential element, and no reason is perceived why· the same rule should not prevail in instances like the present. In Orrick v. Robbins' Admr., 34 Mo. 226, this court has said that, in reference to the quarantine right, it may exist though the farm be composed of several distinct tracts of land. This statement, though not a direct ruling, we are inclined to follow, and particularly so, where, as here, the distinct portions have been used as a unit and not as separate and independent holdings."

The Gentry case was written in 1894 and reference is made in the opinion that the section in respect to the widow's quarantine rights (which is now Section 338, R. S. Mo., 1929, Mo. Stat. Ann., sec. 338, p. 224), had existed at that time for sixty years without change. Section 338, Revised Statutes Missouri, 1929, reads as follows:

"Until dower be assigned, the widow may remain in and enjoy the mansion house of her husband, and the messuages or plantation thereto belonging, without being liable to pay any rent for the same."

So we may say in the present year of our Lord, 1938, that this section, giving quarantine rights for the protection of the widow, has been on the statute books of Missouri unchanged in its verbiage for more than a century.

It is a natural and a wholesome trait of humankind in general, from which judges of courts are, fortunately, not exempt, that change of conditions brings about change of views. The Whalen case was written in 1872. At and prior to that time the property rights of married women were practically nil. They still labored under the restrictions, obscurations and effacements of coverture of the common law in respect to property rights. When a man married a wife he became the owner of all of her personal property by the simple device of taking possession of it. If she had a cow given to her by her father, the husband had the legal right to take it into his possession and sell it as his own property and it was beyond her power to prevent it. It was not until 1875 that the first Married Woman's Statutes were enacted in Missouri seeking to enfranchise her in respect to the ability to contract and in respect to property rights. So the time (1872), when married women's rights were practically non-existent accounts for the sourness and lack of liberality displayed by the author of the opinion in the Whalen case. Thirty years later we find a condition which would justify an extension of the liberality in the construction of the Section in relation to the widow's quarantine rights. In ye olden times farmers were isolated and necessarily so. Bad roads and antiquated means of transportation compelled such isolation. So the family stayed on the farm and lived in the dwelling,

or, mansion house, as this century-old statute pompously designated it. Farming, with improved highways and modern methods of transportation can be done without having any dwelling or mansion house located on the premises. Much farming is done nowadays with the farmer and his family living in a nearby town or village.

It added to the comfort of this eighty-six-year-old testator and his wife, to live in the small town of Wayland, six miles from the farm, and operate it. The wife owned the so-called "big house" in St. Francisville, where the adopted son, Joe, lived with his family and looked after and operated the farm. This "big house" was not situated on the farm, but was two or three miles from it. There was no dwelling house on the farm, and the widow testified that the principal part of their income came from the farm. The aged owner visited the farm two or three times a week, but, on account of the infirmities of age, was, of course, unable to do work on the farm. But we do wonder what virtue or common sense there is in the holding, because this old couple, who could live more comfortably in Wayland, and did not live in a mansion house on a bottom farm, which overflowed and was necessarily unhealthy and infested with mosquitoes and productive of chills and fever, that the widow should be deprived of her quarantine rights.

A few quotations from the opinion in the case of Keeney v. McVoy, 206 Mo. 43, 103 S. W. 946, which concerned quarantine and other rights of widows, and was written in 1907, will illustrate how modernity has changed the extreme sourness and coldness exhibited toward the widow of a deceased landowner, to a spirit of justifiable tenderness for the widow's rights.

On page 55, the opinion states:

"Commencing with common law dower as a basis, the statute gives the widow certain optional rights to better her condition. All these provisions should be liberally construed to further the kindly purposes of the written law."

On pages 65 to 67 the opinion reads:

"The province of courts is to construe, not to construct, statutes—to declare, not to make, laws. To declare the law is not to make it. (*Jus dicere et non jus dare.*) A canon of construction to which all others must give place or to which, more strictly speaking, all others are mere aids, is to get at the intent of the statute and enforce that intent.

"Edmund Plowden in his notes to Eyston v. Studd, 2 Plowden's Rep. 465, points to the primal thing to be observed (with discrimination, of course) in the exposition of every statute. Thus: 'From this Judgment and the Cause of it, the Reader may observe, that it is not the Words of the Law, but the internal Sense of it that makes the Law, and our Law (like all others) consists of two Parts, viz: of Body and Soul, the Letter of the Law is the Body of the Law, and the

Sense and Reason of the Law is the Soul of the Law . . . And the Law may be resembled to a Nut, which has a Shell and a Kernel within, the Letter of the Law represents the Shell, and the Sense of it the Kernel, and as you will be no better for the Nut if you make Use only of the Shell, so you will receive no Benefit by the Law, if you rely only upon the Letter, and as the Fruit and Profit of the Nut lie in the Kernel, and not in the Shell, so the Fruit and Profit of the Law consist in the Sense more than in the Letter. And it often happens that when you know the Letter, you know not the Sense, for sometimes the Sense is more confined and contracted than the Letter, and sometimes it is more large and extensive.'

"It is a maxim that law regards equity. Referring to this maxim, Lord Mansfield comments as follows: 'As for construing the statute by equity, equity is synonymous with the meaning of the legislator . . .' (1 Blackstone's Rep. 1. c. *95.) In his Commentaries (1 Bl. *60, 61) Blackstone goes to the root of the matter, thus:

" 'As to the effects and consequence, the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them. Therefore, the Bolognian law, mentioned by Puffendorf, which enacted "that whoever drew blood in the streets should be punished with utmost severity," was held after long debate not to extend to the surgeon who opened the vein of a person that fell down in the street with a fit.

" 'But, lastly, the most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the reason and spirit of it; or the cause which moved the Legislature to enact it. For when this reason ceases, the law itself ought likewise to cease with it. An instance of this is given in a case put by Cicero, or whoever was the author of the treatise inscribed to Herennius. There was a law, that those who in a storm forsook the ship should forfeit all property therein; and that the ship and lading should belong entirely to those who stayed in it. In a dangerous tempest all the mariners forsook the ship, except only one sick passenger, who, by reason of his disease, was unable to get out and escape. By chance the ship came safe to port. The sick man kept possession, and claimed the benefit of the law. Now here all the learned agree, that the sick man is not within the reason of the law; for the reason of making it was, to give encouragement to such as should venture their lives to save the vessel; but this is a merit which he could never pretend to, who neither stayed in the ship upon that account, nor contributed anything to its preservation.'

"An old case is in the books, arising under a Roman law that forbade strangers to scale the walls on penalty of death. The city was assailed by enemies. Thereat certain strangers within the city flew to its rescue, scaling the walls in defense. It was unanimously held

by the Roman Senate that though they came within the letter, they were without the reason of the law and should not be punished.''

However, the view we take of this case, makes it unnecessary for us to decide whether the alleged conversion of the corn crop occurred at the time Amy Frost, the executrix, qualified as such, in the probate court, or ''about November 1, 1935'' as she alleged in her petition, or at any other time; neither is it necessary for us to decide whether the widow was or was not entitled to the growing crop of corn under the provisions of Section 338, Revised Statutes Missouri, 1929 (Mo. Stat. Ann., sec. 338, p. 224) which deals with the quarantine right of widows. We do hold that the executrix, as such, had no right under the will to interfere with the growing crop or to gather it at maturity; and thus, no right to maintain this suit.

It will be noted that this tract, on which the growing corn crop was located, was devised to three sisters and the heirs of Lucy Wolf, a fourth sister. The widow, having renounced the will, and elected to take a child's share, the sisters and the heirs of Lucy Wolf were the devisees and owners of the land, subject to whatever interest, if any, the widow had in it following her renunciation of the will and election to take a child's share in the estate. Plaintiff Amy Frost, executrix, derived no right whatever to the growing crop of corn under the provisions of the will. It was manifestly not the will of the testator that the executrix should meddle with the growing crop of corn.

Section 17, Revised Statutes Missouri, 1929 (Mo. Stat. Ann., sec. 17, p. 18), which prescribes the form of oath for executors to take, sets out inter alia ''that he will make a perfect inventory of the estate and faithfully execute the last will of the testator.'' Section 37, Revised Statutes Missouri, 1929 (Mo. Stat. Ann., sec. 37, p. 25), prescribing the form of letters testamentary, contains similar admonitions.

It is well settled law that where a person dies intestate, leaving real estate, the heirs, not the administrator, take title to it. The only right which an administrator has in respect to the real estate is to cause it to be sold for the purpose of paying debts which may be allowed against the estate, and then, only if the personal property is not sufficient to pay them.

There are certain sections contained in Article 6 of Chapter I of the administration law Revised Statutes Missouri, 1929, which provide that under certain circumstances the administrator or executor may, under orders of the probate court, take charge of real estate for the purpose of leasing same or making repairs on it, but the record in the instant case is barren of any showing of such authority.

We cite the following authorities in support of the proposition that the growing crop of corn went to the devisees of the land and not to the executor. [Pratte v. Coffman's Executor, 27 Mo. 424; Hayden v. Burkemper, 101 Mo. 644, l. c. 647, 14 S. W. 767, 20 Am. Stat. Rep. 643;

1 Thompson on Real Property, sec. 126, p. 142, 143.] This last named authority states that growing crops "go to the devisee of the land and not to the executor." That "this is the settled rule of the common law, and remains the law in this country, so far as it has not been changed by statute."

It follows that the judgment of the trial court should be reversed, and, it is so ordered. *Becker* and *McCullen, JJ.*, concur.

### ON MOTION FOR REHEARING.

HOSTETTER, P. J.—A motion for a rehearing has been filed on behalf of respondent urging that our opinion is in direct conflict with the opinion of the Supreme Court in Whalen v. Whalen, 51 Mo. 36, wherein the court said: "Under the Statute law of Missouri, where the widow has no dower assigned to her, the growing crop on the land of the deceased husband goes to his executor or administrator and not to the widow."

It does appear on the surface that there is a conflict, but when rightly understood there not only is no conflict, but our opinion is in exact accord with the views set out in the Whalen case. A careful reading of the Whalen case discloses the fact that the deceased husband left a will, because, it is stated in the opinion that the *executor* harvested the wheat crop and sold it as assets belonging to the estate; that the husband had, the previous fall, plowed the ground and sowed the wheat. It further appears that no dower had been assigned to the widow, and that she sued the executor in trespass for taking and carrying away the wheat, and lost her case. But the contents of the will are not set out and it cannot be determined whether the land on which the wheat was grown was devised to any one.

The concluding paragraph of the Whalen opinion reads as follows:

"In other States, where similar statutes to ours exist, the point has been decided in accordance with these views. In the case of Budd v. Hiler, 3 Dutch. 43, it was held that crops growing on the homestead farm at the time of the testator's death, *go to the devisee if the land is devised; and if there is no devise of the land, then to the executor of the testator, and not to the widow, who remains in possession until her dower is assigned.* [See also Parker v. Parker, 2 Pick. 236; Kaim v. Fisher, 2 Seld. 597.]" (Italics ours.)

In the instant case, the land, on which the growing crop of corn was located at the time of the death of the testator, Talleyrand C. Frost, was devised to three sisters of the testator and to the heirs of a fourth sister. So that, our ruling is in strict accord with the ruling in the Whalen case.

The motion for a rehearing is overruled. *Becker* and *McCullen, JJ.*, concur.