**COMMERCIAL CREDIT CORPORATION,** a corporation, Plaintiff-Respondent,

v.

**JOPLIN AUTOMOBILE AUCTION COM-PANY, Inc., Defendant-Appellant.**

No. 8668.

Springfield Court of Appeals.

Missouri.

July 8, 1968.

441

Douglas & Douglas, Neosho, for defendant-appellant.

Roberts & Fleischaker, Loyd E. Roberts, Joplin, for plaintiff-respondent.

STONE, Judge.

This is an action in trover by plaintiff Commercial Credit Corporation to recover from defendant Joplin Automobile Auction Company for the alleged wrongful conversion of seven automobiles (hereinafter thus referred to) covered by chattel mortgages executed and delivered by one Calvin Lacy, a used car dealer in Shawnee, Oklahoma, as mortgagor, to plaintiff as mortgagee, to secure payment of notes evidencing Lacy's indebtedness for monies loaned by plaintiff in financing automobiles on the so-called floor plan. Pursuant to plaintiff's motion at the close of the evidence, the court directed the jury to return a verdict for plaintiff in the principal sum of

$7,820 with interest of $1,238.16 thereon, or in the aggregate sum of $9,058.16. From the judgment entered on that verdict, defendant appeals.

In the course of floor plan financing for Lacy, plaintiff's representatives made periodic checks of the automobiles, usually 25 to 30 in number, on his used car lot. During the latter part of August 1963, it was found that the seven automobiles were missing and that Lacy had disappeared. Efforts to locate the automobiles at that time were unsuccessful, but the following facts eventually came to light. Wholesale automobile auctions, at which only dealers were permitted to buy and sell, were conducted at Joplin, Missouri, by defendant Joplin Automobile Auction Company and at Tulsa, Oklahoma, by Tulsa Automobile Auction Company (hereinafter referred to as Tulsa Auction), then wholly owned by defendant. Earl Howard was president and general manager of both companies. Within the month prior to his disappearance, Lacy had become indebted to defendant and Tulsa Auction in a substantial sum (estimated by Lacy at $7,000 to $8,000 "I think" and said by defendant to have been "approximately $11,000") on "no account checks" issued by Lacy for automobiles purchased at auctions conducted by those companies. Understandably, this generated "some" pressure by Howard for payment.

The original Oklahoma certificates of title to the seven automobiles had been delivered to, and were being held by, plaintiff; but, on the admittedly false representation that the originals had been lost, Lacy procured the issuance of duplicate certificates of title. On the same day those duplicates were received by him, to wit, on August 29, 1963, Lacy delivered the seven automobiles with keys and duplicate titles to Howard at Tulsa Auction; and, on the evening of August 30, 1963, those automobiles were sold at an auction conducted by defendant in Joplin, Missouri. Both Howard and Lacy were present. Checks for the net proceeds of sale were issued to Lacy who immediately endorsed and redelivered them to defendant to be credited and applied on his (Lacy's) pre-existing indebtedness to that company and Tulsa Auction. There is no dispute but that, under the Uniform Commercial Code adopted in Oklahoma in 1961 [now O.S.A. Title 12A], plaintiff's security interest in the seven automobiles had been perfected and Lacy was in default under the security agreements denominated "chattel mortgages" [see 12A O.S.A. § 9–105, subsec. (1) (b), and comment concerning "chattel paper" at p. 244], prior to defendant's sale of those automobiles at auction on August 30, 1963.

Under "Points and Authorities," defendant here undertakes to present only two "points," the substance of which, as pieced out by reference to defendant's two-page "Argument," is (1) that, since "the automobiles were delivered to [defendant] in Oklahoma," it became "[a] buyer in ordinary course of business (subsection (9) of Section 1–201) other than a person buying farm products" [12A O.S.A. § 9–307] and therefore took free of plaintiff's security interest, and (2) that plaintiff should be "deemed to have acquiesced in or consented to the sale" of the seven automobiles or to have waived or been estopped from any complaint concerning that sale, because (so defendant's president Howard said) Lacy had, from time to time during the fifteen months prior to August 30, 1963, sold some eighty-eight automobiles through auctions conducted by defendant at Joplin and Tulsa.

■ *Of point (1).* This contention is wholly without foundation or merit. In the first place, defendant was not a "buyer" of the seven automobiles. For, in answers to interrogatories received in evidence defendant solemnly averred that it had sold the seven automobiles on August 30, 1963, *"as auctioneer"*; that they were sold *"for Calvin Lacy, Shawnee, Oklahoma"*; and again that *"we sold cars owned by Calvin Lacy at auction, issued checks in payment of same to Mr. Lacy after collecting the*

*sale price from the purchaser and deducting our commission."* (All emphasis herein is ours.) In selling those automobiles for Lacy, defendant as auctioneer simply was acting as vendor Lacy's agent. Pasley v. Ropp, Mo.App., 334 S.W.2d 254, 256(1), 80 A.L.R.2d 1231; Shopen v. Bone, 8 Cir., 328 F.2d 655, 658(2); 7 Am.Jur.2d Auctions and Auctioneers § 10, p. 231.

Furthermore, it was indisputably established by defendant's answers to interrogatories that, as we have noted, the net proceeds derived from sale of the seven automobiles at auction were credited and applied on Lacy's pre-existing monetary indebtedness to defendant and Tulsa Auction. Hence, in no event could defendant have been a "buyer in ordinary course of business" within the statutory definition in the Uniform Commercial Code: "'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind * * *. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale *but does not include a transfer * * * in total or partial satisfaction of a money debt."* 12A O.S.A. § 1–201(9).

■ *Of point (2).* This point is equally devoid of substance or value. For proper resolution of it, we need not essay definition or differentiation of acquiescence, consent, waiver and estoppel, the several theories commingled in the abstract statement constituting this point, as lifted from the only citation thereunder, to wit, annotation 96 A.L.R.2d 208, 233 (§ 13). Suffice it to say that, for any one of those theories, i. e., acquiescence, consent, waiver and estoppel, to have become available and useful in defense of instant plaintiff's cause of action, it would have been an indispensable prerequisite for the evidence to have permitted and justified a finding that, prior to August 30, 1963, plaintiff had knowledge, actual or constructive, of the alleged fact upon which defendant sought to charge plaintiff with such acquiescence, consent, waiver or estoppel, namely, that Lacy had sold eighty-eight automobiles through defendant or Tulsa Auction.

Recognizing the essentiality of such prior knowledge on the part of plaintiff, defendant's counsel boldly presumes to supply it in the "Argument" section of their brief by including the factually unsupported assertion that "plaintiff * * * certainly knew, or should have known, how these automobiles were being sold." But we cannot agree that the mere fact of prior sales by Lacy through defendant or Tulsa Auction would charge plaintiff with notice or knowledge thereof; and a painstaking review of the transcript reveals not a scintilla of competent evidence that plaintiff had such knowledge prior to August 30, 1963, and likewise no evidence from which such knowledge fairly and reasonably might be inferred. Furthermore, there was no showing (a) that any of the automobiles allegedly sold by Lacy through defendant or Tulsa Auction prior to August 30, 1963, were subject to chattel paper, or (b) that plaintiff had any interest whatever in any of those automobiles, or (c) that any of those prior sales were in any respect wrongful or improper. Neither of the two foreign cases digested in annotation 96 A.L.R.2d 208, 223 (§ 13), as supporting the abstract statement submitted in defendant's second point, is factually analogous to the case at bar or legally persuasive here. On the record before us, this point must be denied.

■ "The legal wrong denominated 'conversion' is any unauthorized act of dominion or ownership exercised by one person over personal property belonging to another in denial of, or inconsistent with, his right." 89 C.J.S. Trover & Conversion § 1, pp. 531–532; Blum v. Frost, 234 Mo.App. 695, 703, 116 S.W.2d 541, 546(4). The acts on which instant plain-

tiff relies as working a conversion and as constituting the foundation of the case at bar were defendant's sales of the seven automobiles at its auction in Joplin, Missouri. And whether those acts were wrongful and actionable is to be determined by the lex loci delicti (i. e., the law of the place of the wrong) and thus by the law of Missouri. Leflar, Conflict of Laws, § 110, p. 207; 16 Am.Jur.2d Conflict of Laws § 71, pp. 109–110; Restatement, Conflict of Laws, § 379, p. 458; 2 Beale, Conflict of Laws, § 378.2, p. 1289.

■■ In accordance with the overwhelming weight of authority in other jurisdictions [annotation 96 A.L.R.2d 208, 212 (§ 3), 218 (§ 7)], our Missouri cases hold that an auctioneer who, without authorization from the secured party (mortgagee), sells mortgaged property delivered to such auctioneer by the debtor (mortgagor), and turns over the proceeds to the latter, renders himself liable to the secured party for a conversion, even though he acted in good faith and had no knowledge, actual or constructive, of the secured party's interest in the property. Mohr v. Langan, 162 Mo. 474, 501–502, 63 S.W. 409, 417(4); Wisdom v. Keithley, 237 Mo.App. 76, 90–91, 167 S.W. 2d 450, 457(20); City National Bank v. Goodloe-McClelland Comm. Co., 93 Mo. App. 123, 138(10). See National Bank of Commerce v. Morris, 114 Mo. 255, 21 S.W. 511, 19 L.R.A. 463; Everett v. Barse Live Stock Comm. Co., 115 Mo.App. 482, 487– 488, 88 S.W. 165, 166(4); Arkansas City Bank v. Cassidy, 71 Mo.App. 186, 198–199 (3, 4). For that matter, it is said generally that the "question of good faith, and the additional questions or elements of motive, knowledge or ignorance, or care or negligence, are not involved in actions for conversion." 89 C.J.S. Trover & Conversion § 7, pp. 536–537; Schulte v. Florian, Mo. App., 370 S.W.2d 623, 626(4). A fortiori, the same principles impose liability upon an auctioneer who, as did instant defendant, not only sells mortgaged property without authorization from the secured party and turns over the proceeds to the debtor (mort-

gagor) but also forthwith regains those proceeds from the debtor and retains them for himself. All of the basic facts upon which plaintiff's cause of action rested having been established either by documents, the authenticity and accuracy of which were unquestioned, or by defendant's answers to interrogatories and the testimony of its president and general manager, the trial court did not err in directing a verdict for plaintiff. Coleman v. Jackson County, 349 Mo. 255, 261, 160 S.W.2d 691, 693(2); Rodgers v. Seidlitz Paint & Varnish Co., Mo., 404 S.W.2d 191, 198; M.F.A. Central Cooperative v. Harrill, Mo.App., 405 S.W.2d 525, 527(3).

■ The *amount* for which a verdict was directed, i. e., in the principal sum of $7,820 with interest of $1,238.16 thereon, has given us concern. Referring first to the *principal sum,* we have before us (1) defendant's answers to interrogatories establishing the fact that it sold the seven automobiles at auction for the aggregate sum of *$8,050,* (2) the statement in plaintiff's brief that defendant "sold the [seven automobiles] at its Joplin auction * * * for the sum of *$7,855*," and (3) the judgment for *$7,820.* Neither the transcript nor the briefs offer any explanation for or reconciliation of these three figures. However, plaintiff does not and, since it has not appealed, could not complain [Moore v. Hoffman, 327 Mo. 852, 39 S.W.2d 339, 345(18), 75 A.L.R. 135; Hardin v. Ray, Mo.App., 404 S.W.2d 764, 769(5)]; and, since the judgment was for the lowest of the three figures, any error in this particular was in defendant's favor and thus harmless to it. So, we pass this unilluminated result as to principal.

■ The matter of *interest* may not be so easily put aside. V.A.M.S. § 537.520 declares that "[t]he jury on the trial of any issue, or on any inquisition of damages, may, if they shall think fit, give damages, in the nature of interest, over and above the value of the goods at the time of the conversion or seizure." Hence in trover

for wrongful conversion, which sounds in tort [89 C.J.S. Trover & Conversion § 3, p. 533], an award "in the nature of interest" is, as the statute indicates, actually an admeasurement of "damages by the ruling rate of interest,—not as interest, but by way of compensatory damages." Lack v. Brecht, 166 Mo. 242, 260, 65 S.W. 976, 980. After pointing out that Section 4430, R.S. 1889 [now V.A.M.S. § 537.520], had been "substantially the same since 1845," our Supreme Court emphatically declared almost seventy-five years ago that: "Whatever the rule may have been in the absence of any statutory enactment, there is now no room for doubt. Language could not be plainer. The manifest intention of the legislature by this statute was that, in this class of cases, the question of *interest as damages* should be for the jury, and not for the court." State ex rel. Robertson v. Hope, 121 Mo. 34, 40–41, 25 S.W. 893, 895. That early determination has been confirmed and followed in an unbroken line of decisions holding that, in actions for conversion, a trial court errs in directing the jury to allow interest. Carson v. Smith, 133 Mo. 606, 615–616, 34 S.W. 855, 858(6); Asadorian v. Sayman, Mo., 233 S.W. 467, 475(1); Harbaugh v. Ford Roofing Products Co., Mo., 281 S.W. 686, 689(9); Brede Decorating, Inc. v. Jefferson Bank & Trust Co., Mo., 345 S.W.2d 156, 165(10); Jensen v. Turner Bros., Mo.App., 16 S.W.2d 742, 745–746(7); Simpson v. Bantley Realty Co., 142 Mo. App. 490, 126 S.W. 999, 1000(3); Meyer v. Phoenix Ins. Co., 95 Mo.App. 721, 69 S.W. 639, 640(3).[1]

If instant plaintiff sought to recover "damages, in the nature of interest" [V.A.M.S. § 537.520] in this action for conversion, defendant was entitled to have had that issue submitted to and determined by the jury, and the unauthorized direction of a verdict for interest constituted plain error affecting defendant's substantial rights and resulting in manifest injustice, which may be considered under V. A.M.R. Rule 79.04 even though not properly preserved and presented for appellate review. Cf. Jaeger v. Agnew, Mo.App., 252 S.W.2d 847, 849(3); Williams v. Cobb, Mo.App., 239 S.W.2d 770, 773(6). Plaintiff is not entitled to affirmance of the judgment for interest, but that error may be cured by remittitur. Harbaugh v. Ford Roofing Products Co., supra, 281 S.W. at 689; Lindenlaub v. Ozora Marble Quarries Co., Mo.App., 70 S.W.2d 1110, 1111(6); Flegle v. Brewster, Mo.App., 59 S.W.2d 769, 771(5); Jensen v. Turner Bros., supra, 16 S.W.2d at 748.

Accordingly, if plaintiff will, within fifteen days from the date hereof, enter a written remittitur in this court in the sum of $1,238.16 (the interest assessed), the judgment will stand affirmed for $7,820 as of the date on which judgment was entered in the trial court; otherwise, the judgment as to damages will be set aside and the cause remanded for a new trial on the issue of damages only. It is so ordered.

HOGAN, P. J., and TITUS, J., concur.

---

1. Of course, in a *jury-waived* case, the trial court, being the trier of the facts, is empowered to award damages in the nature of interest [McCallister v. Cord Moving & Storage Co., Mo., 301 S.W.2d 852, 854, 856(8); Newell v. Kern, Mo. App., 218 S.W. 443, 444, 446(5)]; and, in giving such judgment as the trial court ought to have given in a *jury-waived* case, the appellate court may make such award. Independence Flying Service, Inc. v. Ailshire, Mo., 409 S.W.2d 628, 629, 632.