In the Matter of the ESTATE of Nancy M. ALEXANDER, Deceased.

Annie DOWELL and Robert Patton, Respondents,

v.

Lee S. McELHINEY, Appellant.

No. 49114.

Supreme Court of Missouri,

Division No. 1.

Sept. 10, 1962.

Edwin Yagel and Errol Joyce, Brook-field, and Robert N. Jones, St. Louis, for appellant.

Edward R. Jayne, Kirksville, and John F. Carmody, Moberly, for respondents.

HOUSER, Commissioner.

This is an appeal from the judgment of August 3, 1961 of the Circuit Court of Adair County in the matter of the Estate of Nancy M. Alexander, Deceased. It involves the objections of Annie Dowell and Robert Patton, two heirs of the deceased, to the final and two previous settlements filed by Lee S. McElhincy, the administrator, an accounting of his stewardship, and an effort to modify the settlement and remove the administrator from office for misconduct. The first appeal in this case was dismissed as premature because the judgment appealed from (rendered June 16, 1958) was not final, no accounting having been taken. In re Alexander's Estate, Mo. Sup., 327 S.W.2d 218. After our mandate went down the Circuit Court of Adair County appointed a referee who conducted a hearing and made a detailed report recommending certain charges and credits to the account of the administrator; finding that the administrator owed a balance of $48,-673.04, and finding gross mismanagement. McElhiney's exceptions to the referee's report were overruled. Two of the heirs filed five exceptions, four of which were sustained. New administrators were appointed. On August 3, 1961 the court entered a final judgment confirming the judgment of June 16, 1958 sustaining the heirs' objections to and striking the final settlement; removing McElhiney as administrator; revoking his letters of administration as of June 16, 1958; amending the referee's report to satisfy the heirs' four exceptions; finding that McElhiney should be charged with the sum of $157,680.51 and credited with the sum of $97,855.43; otherwise approving the referee's report and adopting its findings, and rendering judgment ordering McElhiney to pay his successors $59,-825.08, and to pay costs in the sum of $753.68. McElhiney filed a motion to set aside and to enter judgment in his behalf, or in the alternative for a new trial. Over-

ruled, McElhiney appealed from the judgment of August 3, 1961.

Appellant's first point is a two-fold attack upon the jurisdiction of the Adair County Circuit Court. Initially, appellant contends that Judge Gutting, who made the order changing the venue from Linn County Circuit Court, was disqualified.

The regular judge of the Circuit Court of Linn County (to which the cause had been certified by the probate court of that county) having been disqualified, the Supreme Court upon the request of the judge transferred Honorable Joseph L. Gutting, Judge of the 37th Judicial Circuit, to Linn County for the trial of the matter. The administrator, not desiring to try the case before that judge or in that county, filed a "Petition and Application For a Change of Venue," alleging that both Judge Gutting and the inhabitants of Linn County were prejudiced against him, and that one of the objectors had an undue influence over the mind of Judge Gutting and over the inhabitants. The application and affidavit were taken up by Judge Gutting, who considered and found them "sufficient, and being accompanied by the regular docket fee of $10.00, the venue of this cause" was "awarded to the Circuit Court of Adair County, Missouri, in the First Judicial Circuit." After the matter reached the latter court the administrator filed a motion to remand to Linn County, charging that the change was illegal and void; that Judge Gutting was wholly without power to grant it and that the judge of the Adair County Circuit Court was without jurisdiction. The motion to remand was overruled and the matter proceeded to judgment in the latter court. Appellant-administrator argues that when Judge Gutting found the application sufficient he was thereby disqualified and had no further power to grant the change of venue; that he should have called in another judge [1] or requested the Supreme Court to transfer a judge to Linn

1. Under Section 15, Art. V of the constitution, V.A.M.S.

2. Under Section 6, Art. V of the constitution.

County[2] to pass upon the application for change of venue from the inhabitants.

The statutes in effect on March 10, 1958, when the order awarding a change of venue was made, were as follows: Section 508.-090, RSMo 1949, V.A.M.S., as amended Laws 1957, p. 294, § 1, provided that a judge may be disqualified in any civil suit for prejudice or undue influence of the opposite party over the mind of the judge; that a change of venue may be awarded in any civil suit for prejudice of the inhabitants of the county against the applicant, or undue influence of the opposite party over the inhabitants. Section 508.130, RSMo 1949, V.A.M.S., as amended Laws 1957, p. 294, § 1, authorized a party to present a petition setting forth the cause of his application "for disqualification of the judge or for a change of venue." Section 508.140, RSMo 1949, V.A.M.S., as amended Laws 1957, p. 294, § 1, provided that if reasonable notice has been given the court or judge "shall consider the application, and if it is sufficient, the judge shall be disqualified or a change of venue shall be awarded to some county in the same, adjoining or next adjoining circuit, convenient * * * and where the causes complained of do not exist. * * *" Civil Rule 3.15, then in effect,[3] provided that if the grounds for change of venue are then known the application for change of venue shall be joined with any motion made under § 509.290 (lack of jurisdiction, improper venue, insufficiency of process, etc.), otherwise these objections are waived, and "In case the application for change of venue is granted for objection to the judge, the court shall not decide any other matters raised at the same time[4] but these shall be determined by the court to which the case is sent upon change of venue."

■ The Circuit Court of Adair County had jurisdiction. Under the law as it existed on March 10, 1958 Judge Gutting was not disqualified by the mere allegation of prejudice on the part of the judge,[5] and he had full power to award the change of venue. Compare State ex rel. Schonoff v. O'Bryan, 102 Mo. 254, 14 S.W. 933; Wright v. Kansas City, 187 Mo. 678, 86 S.W. 452, 457, 458, and Leise v. Mitchell, 53 Mo.App. 563. The paper filed by the administrator brought two matters to the attention of the judge (the objection to the judge and the objection to the inhabitants). Judge Gutting considered it as an application for a change of venue, which he had a right to do. Upon finding it sufficient and that the docket fee had been paid it was his duty to change the venue from Linn County. He properly awarded the change of venue to a county in an adjoining circuit. There was no necessity to call in another judge under Section 15, Art. V, of the constitution or to request the Supreme Court to transfer a judge to Linn County under Section 6 of said Art. V. As stated in Schonoff, supra, 14 S.W., loc. cit. 935, it is not the intention of the law to permit a cause to be bandied about like a shuttlecock from judge to judge or from court to court without affording effective and prompt relief. By awarding the change of venue, Judge Gutting satisfied the administrator's second objection, and the incidental effect of his order was to satisfy the first objection, for it took the case away from Judge Gutting and placed it before the regular judge of the 1st Judicial Circuit. Appellant-administrator received all the relief he demanded, and has no cause for complaint.

■ Next, appellant contends that neither probate nor circuit court acquired jurisdiction over the objections to the final settlement because not filed within 10 days after filing the final settlement, as required by § 473.590. This proceeding, commenced before the enactment of the Probate Code of

3. Later superseded by Civil Rule 51.05(b), V.A.M.R.

4. i. e., the matters referred to in § 509.-290.

5. In this connection see Civil Rule 51.03 (b), which went into effect April 1, 1960.

1955, was pending on its effective date (January 1, 1956) and therefore § 473.590 would govern the time of filing such objections, unless the application of § 473.590 would not be feasible or work injustice (Enactment clause, Laws 1955, p. 385, Sec. A. 1), in which event the former procedure would apply. We are of the opinion that the application of § 473.590 would work injustice, and that the former procedure should apply. Prior to January 1, 1956 there was no statute prescribing the time within which objections to final settlements should be filed, but it was the practice for interested persons to file written exceptions to objectionable items of a final settlement in probate court, In re Mill's Estate, 349 Mo. 611, 162 S.W.2d 807, and cases cited, 811, and they were cognizable if filed at the same term at which the final settlement was approved. McNally v. Hawkins, 163 Mo. App. 692, 147 S.W. 503; 4 Maus, Missouri Practice, § 1385. The instant exceptions were filed at the same term and therefore were timely filed.

■ Appellant's second point is that the judge of the Adair County Circuit Court erroneously rendered the judgment of *June 16, 1958* against the administrator on the ground that he was not present, and erroneously refused to set it aside on the ground that appellant was again absent on the day his attorneys took up his motion to set it aside. This point was not raised in the motion for new trial and is not here for review. This is an appeal from the judgment of August 3, 1961, not an appeal from the judgment of June 16, 1958. If appellant intended to raise the question whether the court properly removed him as administrator, we simply say that under this record the court not only had the right but the imperative duty to remove this administrator by its final judgment of August 3, 1961.

Appellant's third point, that disbursements to appellant and his counsel for services rendered were improperly disallowed will be determined in the item-by-item consideration of the accounting.

■■ Appellant's fourth point is: "The burden was upon respondents to prove their charges in their action to eliminate appellant as administrator." This recital of an abstract statement of law raises nothing for appellate review, under Civil Rule 83.05 (e). Nor is there any such point in appellant's motion for new trial. In passing, however, we restate the rule from Ladd v. Stephens, 147 Mo. 319, 48 S.W. 915, 921, that the burden of proof is upon him who brings charges of maladministration to make out a prima facie case, and that the burden of proof is not upon the administrator to exonerate himself from such charges, except that when it is admitted by the administrator or shown that he has received assets, he is bound to produce them or account for them. That movants sustained their burden of proof of maladministration will be made evident.

Appellant's fifth point is that the referee and the court erroneously charged the administrator or refused him credit on thirteen separate items, as follows:

■ 1. *Interest on U. S. Treasury Bonds.* Appellant concedes the estate owned certain described and numbered U. S. interest-bearing bonds, inventoried at $72,000, bearing from 2½ to 3% interest, payable semi-annually. The amount of the annual income from these bonds was subject to simple mathematical calculation. It was appellant's duty to collect and account for this income during the period of his administration. Appellant testified he deposited all checks for interest on these bonds and that they were included "someplace in this settlement" but he was unable to point out where they appeared. He had no records and admitted he knew of "no way in the world" to find this in the settlement. He completely failed to account for a considerable portion of the amount of interest which accrued during his incumbency. This is a proper charge against appellant.

■ 2. *Dividends on corporate stocks, stock rights and accrued interest on*

*corporate debentures.* The inventory listed 18 shares of United Stores Corporation preferred stock; 20 shares of American Telephone and Telegraph common stock; 175 shares of American Sugar Refining Company common stock and 600 shares of Sinclair Oil Corporation common stock. Debenture purchase rights on the telephone stock accrued during the administration. It was appellant's duty to collect and account for all of these dividends, rights and interest during that period. There was evidence of the amount of the dividends declared on these stocks, the value of the rights, and the amount of interest which accrued on the debentures. Appellant did not claim he did not receive them. He accounted for some but not all of these items, and offered no explanation why they were not fully accounted for. He had no records (claiming they were destroyed in a hotel fire) and could not remember what happened to the rights. These items are proper charges against appellant.

■■■■ 3. *Cadillac automobile.* While acting as guardian for Nancy M. Alexander, an insane person, appellant concededly purchased a Cadillac automobile for $3,156.-27, paid for it out of guardianship funds, had the title put in his own name, used the automobile partly for his own individual purposes both before and after the death of Nancy, but failed to inventory the car as an asset of decedent's estate. Appellant's failure to inventory the Cadillac does not relieve him of the duty of accounting for it. 34 C.J.S. Executors and Administrators § 833, p. 954. When appellant as guardian took the funds of his ward and bought an automobile in his own name he was guilty of a conversion of the funds of his ward. Appellant having treated the car as an asset of the decedent's estate he was properly charged with its value in this accounting. Its value was properly determined as of the time of the conversion. Deer v. People's Bank of Springfield, Mo.App., 47 S.W.2d 787; Pantz v. Nelson, 234 Mo.App. 1043,

135 S.W.2d 397. Three and a half years after letters were issued appellant filed in the probate court an application for an order authorizing him to sell the Cadillac to himself, alleging its value at the time of the death of Nancy at $1,800 and its value at the time of the application at $500. The probate court did not pass on this motion, but appellant testified that he "discussed" it with the probate judge and thereafter purchased the Cadillac, paying $1,800 to the estate therefor. There was no documentary evidence of payment. On this de novo review we reach the same conclusion arrived at by referee and court, i. e., that this item is a proper charge against appellant.

■■■ 4. *Hospital and medical services.* Before any written demand was presented and without authority from the probate court appellant paid two doctors $2,320 for medical and hospital services rendered Nancy. A month and a half later, on February 17, 1953, a written demand was presented to the probate court for "Residence calls and medication, 4/3/47 to 9/22/49" for $390, and "Hospital care and medications, 9/22/49 to 5/17/52" in the amount of $1,930, a total of $2,320. Nancy was adjudged insane on January 6, 1950 and McElhiney was appointed her guardian that date. She died on May 18, 1952. Under the statute in force on January 6, 1950, § 458.320, RSMo 1949, V.A.M.S.,* all demands against the estate of an insane person were required to be presented for allowance within one year from the date of the appointment of the guardian, or from the first insertion of the publication of notice of appointment, or else be forever barred. Section 458.320 applied to claims which accrued prior to adjudication of incompetency and appointment of guardian, Trask v. Davis, Mo.App., 297 S.W.2d 792, 797, so that the doctors', medicine and hospital bills incurred in caring for the ward prior to January 6, 1950 should have been paid by the guardian, on demand presented to the probate court in the guardianship

* Now Sections 475.140, 475.205, 475.210 RSMo 1959, V.A.M.S.

proceeding, but so far as the record shows no such demand was ever presented to the probate court in the guardianship proceeding. Instead, appellant as administrator waived notice and consented to the allowance of the demand in the administration of decedent's estate and an order allowing the demand was made. Creditors may not at their pleasure ignore the guardianship statutes and after the death of the ward present to the administrator of the ward's estate claims accruing prior to the adjudication of incompetency and appointment of a guardian, for the estate "must be administrated by the guardian as required by the statute." Greever v. Barker, 204 Mo.App. 190, 223 S.W. 1087, 1089. Accordingly, appellant as administrator should have pleaded § 458.-320 as a bar to the enforcement of that portion of the demand in question incurred between April 3, 1947 and January 6, 1950. Greever v. Barker, supra. The demand for hospital care and medication rendered to the ward after January 6, 1950 and during the period of the guardianship was properly presented to the administrator of the ward's estate, upon the death of the ward. Trask v. Davis, supra; 44 C.J.S. Insane Persons § 91, a. (1), pp. 246, 247. To the extent that Greever v. Barker, supra, announces a different rule it is overruled, for the reasons stated in Trask v. Davis, supra, 297 S.W.2d, loc. cit. 797. Appellant was entitled to credit for the payment of that portion of the demand in question which represented the reasonable value of necessary hospital care and medication supplied to the ward from January 6, 1950 to May 17, 1952. The refusal by the referee and circuit court to give appellant any credit on this item was erroneous, and the cause must be remanded for the purpose of conducting a hearing and correcting this error.

■■■■ 5. and 6. *Expenses of operating Nancy M. Alexander's farm.* In his settlement of November 7, 1955 appellant charged himself with farm income (soy beans, corn, timothy seed) and took credit for expenses of operating the farm, although appellant had not sought or obtained an order from the probate court authorizing him to operate the farm. In their accounting the referee and circuit court excluded income from and expenses of operating the farm. This was proper. The crops in question were not growing crops at the time of Nancy M. Alexander's death, but were planted thereafter. An administrator has nothing to do with crops planted after the death of the owner of the land. An administrator has no rights in or authority over land owned by a decedent except to take charge of growing crops and to cause the land to be sold for the purpose of paying debts which might be allowed against the estate, if the personal property is insufficient to pay the debts. Blum v. Frost, 234 Mo.App. 695, 116 S.W.2d 541, 549. The after-planted crops were not assets of the estate in the hands of appellant as administrator, but belonged to the heirs. 33 C.J.S. Executors and Administrators § 106, p. 1064; Schouler on Wills, Executors and Administrators, Sixth Ed., Vol. 3, § 2030; Rodman v. Rodman, 54 Ind. 444; Kidwell v. Kidwell, 84 Ind. 224. The referee and circuit court properly refused to credit appellant with expenses of the operation of the farm.

■■■■ 7. *Premiums on the administrator's bond, after two years of administration.* Appellant was appointed administrator on May 23, 1952. On February 17, 1953 he filed his first settlement. No settlement having been made in 1954 two heirs filed a petition to require him to make settlement. On January 17, 1955 the probate court made an order finding that appellant had failed to make proper settlements according to the statutes, docket and orders of the court and requiring him to make a settlement on February 15, 1955 or show cause why he should not do so, why an attachment should not issue for such failure, and why his letters should not be revoked. On November 5, 1955 appellant made what was labeled an "annual settlement." On September 7, 1956 an heir filed a complaint seeking the removal of appellant as administrator for failure to file proper settle-

ments, to account for the assets of the estate, commission of waste, mismanagement of the estate, etc. On January 7, 1957 another heir filed a motion to require appellant as administrator to make final settlement and for a citation. On May 17, 1957 the administrator filed his "final settlement," which provoked the instant proceedings. Appellant was removed as administrator and his letters revoked by the interlocutory judgment of June 16, 1958. From 1952 to 1958 appellant as administrator made three settlements. In his settlements he took credit for administrator's bond premiums in each of five years in the amount of $460. The referee and circuit court approved the first two bond premium payments of $460 each but refused to credit appellant with the remaining three $460 payments on the ground that they were not necessary; that if the estate had been administered promptly and efficiently it could have been closed in a maximum of two years. The applicable section relating to the time for the making of a final settlement, § 465.160, RSMo 1949, V.A.M.S.**, provided that a final settlement should be made at the first regular term of the court after the expiration of one year from the date of granting of letters on the estate "unless further time has been given by the court by an order entered of record." No such extension of time was applied for or obtained from the probate court. Statutory provisions relating to the time within which settlements are to be made, the purpose of which is to secure the expeditious administration of the estates of decedents, are to be strictly complied with. 34 C.J.S. Executors and Administrators § 829. The administrator should proceed with diligence and account and settle up the estate as soon as is reasonably possible without jeopardizing the estate. A failure so to do is an omission of duty and breach of trust. 34 C.J.S. Executors and Administrators § 835. An administrator must justify an unusual delay in the discharge of his trust. In re Hurley's Will, 193 Wis. 20, 213 N.W. 639. This was an un-

complicated estate. The assets consisted of cash, bonds, stocks, household goods and unencumbered real estate. The claims were few and conventional, with the exception of the demand of the two doctors which, if contested with diligence, could easily have been disposed of within two years. The only reason suggested by appellant why additional time was required to settle this estate is that the securities could not be found. This is not a reasonable excuse. The securities at all times in question were in decedent's safety deposit box in the local bank where she had done business for years. By the exercise of reasonable diligence and within a reasonable length of time after his appointment appellant could have ascertained the existence of the box and obtained possession of its contents, thus permitting the prompt settlement of the estate and eliminating the necessity of paying the last three years' premiums on the administrator's bond. The estate should not be held liable for excessive bond premiums occasioned by appellant's inordinate and unexcusable delay in closing the estate. The referee and circuit court properly denied credit to appellant for the last three bond premiums. See Thompson's Estate v. Martin, Mo.App., 133 S.W.2d 677, 679.

■ 8. *Premium on an indemnity bond for "lost" U. S. government bonds.* Appellant asked for but was denied credit for $431.25 paid as a premium for an indemnity bond required in order to cash $15,000 worth of U. S. Savings bonds. These bonds had been part of the assets of the guardianship estate. Appellant had actual possession of them at the institution of the guardianship proceeding, as acknowledged by him in writing in the inventory. In February, 1953 appellant inventoried these bonds as part of decedent's estate. More than $3\frac{1}{2}$ years later, in December, 1955, appellant had not yet "found" them. Having had their actual possession during the guardianship proceeding appellant was guilty of gross carelessness and mismanagement in

** Now Section 473.587 RSMo 1959, V.A.M.S.

"losing" these bonds and incurring an unnecessary liability for this substantial premium. The estate should not suffer as a result of appellant's incompetence in this regard. The referee and circuit court properly denied appellant credit for this item.

9. *Safety deposit box rent in, 1956.* Appellant was properly denied credit on this item, as an expense for which there would have been no necessity had the estate been administered promptly.

10. *Taxes.* Appellant asked for but was denied any credit for amounts of income taxes paid to federal and state governments for the years 1952, 1953 and 1954, and an amount denominated "Additional federal inheritance tax." The federal income tax returns were filed late. The return for 1952 was filed in August, 1954. The returns for 1953 and 1954 were filed on June 26, 1956, after the government had filed its lien for taxes. The state returns were made after the filing of the federal returns. All of the returns were fragmentary, gave no detail, and little or no information as to source of income. From one of the returns and from appellant's admissions it is evident that the net returns from farming operations were included in the income on which appellant paid income taxes during the three years. Penalties and interest incurred by the delinquent filings of the federal income tax returns were as follows: 1952: penalty, $214.80, interest $34.76; 1953: penalty, $375.74, interest $157.59; 1954: penalty $321.19, interest $70.47. Appellant testified his attorneys took care of the federal estate tax return and were responsible to see that it was properly made and filed on time. Although Nancy died May 18, 1952, appellant filed no federal estate tax preliminary notice (due 15 months after death) until May 3, 1955. This matter was so improperly handled that it resulted in several additional assessments, penalties, and interest. There was no attempt by appellant at the hearing before the referee to explain the grossly irregular

manner of handling these tax returns; no evidence that appellant or his attorneys ever applied for an extension of time to file income tax returns; no evidence to explain why they were not properly prepared and timely filed or to justify imposition of penalties and interest. At the hearing appellant demonstrated almost complete ignorance and indifference about the matter. He had no records; did not know who prepared the delinquent state income tax returns; could not tell how much of the income was from farming operations and how much was from dividends and interest; could not segregate the government bond interest from the corporate dividends, or tell how much was returned in any particular year from any particular source. He *was not certain whether he or his attorneys filed certain returns and did not know* when they were filed. He admitted he allowed a lien to be filed against the estate for more than $4,000. When asked what that was he said "It must have been estate tax." When asked what the item of $2,050.76 was ("Additional federal inheritance tax," for which appellant claimed credit) *appellant did not know; had no records on it;* had no voucher to support it. His attorneys who "handled" the estate tax matter could not find a carbon copy of the return; did not know whether it was in appellant's papers or whether they had lost it, and offered no explanation of the loose and unbusinesslike manner in which they handled the tax phases of this administration.

An administrator is entitled to credit in his account for taxes properly paid by him in the exercise of his official duties, National Board of Christian Women's Board of Missions v. Fry, 293 Mo. 399, 239 S.W. 519; In re Flynn's Estate, Mo.App., 142 S.W.2d 1069, but not for taxes made necessary by his own neglect of duty, misconduct or wrongful act, "and, of course, amounts improperly paid as taxes by him will be disallowed, unless, in the furtherance of justice, the circumstances in the particular case require their allowance, as

where no prejudice results to those beneficially interested in the estate." 33 C.J.S. Executors and Administrators § 235, p. 1238. Where penalties and interest are allowed to accrue by unexplained failure to file tax returns on time, an administrator's claim for credit for such payments should be disallowed. Cook v. Aronheim, 186 Md. 138, 46 A.2d 105; In re Connolly's Estate, 79 Mont. 445, 257 P. 418; In re McCafferty's Will, 147 Misc. 179, 264 N.Y.S. 38; In re Ducas' Estate, Sur., 109 N.Y.S.2d 17, aff., 279 App.Div. 730, 108 N.Y.S.2d 1016. Applying these rules to the instant facts we see no basis for the disallowance of the principal amount of the income taxes, even though some of the income on which taxes were paid was from farming operations conducted by appellant without court authority. If the administrator had not paid income taxes on the income from the farm the heirs would have been required to do so, and it has not been shown that the heirs have suffered harm thereby. See Cornet v. Guedelhoefer, 219 Ind. 200, 36 N.E.2d 933, 938 [17], 37 N.E.2d 681. But the referee and circuit court properly disallowed the amount of penalties and interest which the administrator suffered to accrue. The estate should not be penalized for the failure of the administrator to file tax returns on time where, as here, money was available to pay the taxes and no valid explanation for his tardiness was advanced. The judgment therefore is erroneous to the extent that appellant was denied credit for income taxes paid, but correct insofar as penalties and interest are concerned. The record indicates that a part of the item "Additional federal inheritance tax" (for which credit in the sum of $2,050.76 was asked) was penalty and interest, but the evidence is not clear as to how much of that item was penalty and interest. On remand further inquiry into this phase of the accounting will be made, and credit will be denied appellant for any penalties and interest which accrued as a result of his unexplained late filing of the inheritance tax return.

11. *Overlapping and duplicating items.* In his settlements appellant asked credit for federal estate taxes paid as follows:

2-17-1955 "Director of Internal Revenue-
Inheritance Tax" ............$ 5,033.73
5-2-1955 "Director of Internal Revenue,
Federal Estate Tax" ........ 11,130.20

The referee and circuit court disallowed the $5,033.73 item on the ground that these are overlapping and duplicating items, not explained by appellant. There is insufficient evidence on this record for this Court to determine this question, which should be clarified at the hearing to be conducted on remand.

12. *Final distribution checks.* In the final settlement appellant asked credit for disbursement of $658.29 to each of five heirs, and $3,291.45 to each of six heirs. Cancelled checks or vouchers substantiating payment of these items were not filed or produced. The referee and circuit court disallowed these items. Appellant testified he made and delivered checks to each of these distributees as shown on the final settlement and contends the checks were issued but the distributees have refused to cash them; that he should not be charged with these items; that he cannot compel the heirs to cash their checks. The judgment of the court makes this provision: "In the event the said Lee S. McIlheny presents proper vouchers for any of the payments shown by item eighty-one (81) of said report, that he be given credit therefor." If no such vouchers or cancelled checks shall have been produced or filed when the case comes on for hearing on remand the judgment should be amended to direct appellant to stop payment on any uncashed checks and to pay the amounts of any such uncashed checks into the registry of the court for distribution by the court, failing in which the charges against appellant in these amounts shall stand in the final computations.

13. *Administrator's fees and counsel fees.* Appellant asked credit for but the

referee and circuit court disallowed administrator's fees in the total sum of $8,269.79, and disallowed fees paid by the administrator to his attorneys in the sum of $10,000. The referee disallowed these items for these reasons: "[R]ather than having rendered services to the estate, the administrator and his attorneys have permitted its assets to be wasted, have failed to keep proper accounts and records, have been unfailingly delinquent and have rendered it extremely difficult for themselves, much less anyone else, to determine what the assets of the estate were, what has come into the estate, where it came from, when it came, where it has gone and why. No explanation is offered as to why every tax return, both state and federal, was delinquent, why they did not request extensions of time if they were needed, why the farm income was included in the tax computations and in the administrator's settlements, why the large annual bond premiums were permitted to continue year after year and the bond not reduced in amount after the $80,000 partial distribution, why the Cadillac was not inventoried as an asset of the estate, why an administrator ad litem was not appointed when the administrator sought to deal with himself by buying the Cadillac, why they did not keep accurate records as to which bonds were sold and when, which shares of stock were sold and when, the date upon which shares and issues of stock dividends were received, why the interest on the government bonds and the dividends on the stock were commingled beyond recognition even by them, why they paid claims in excess of $100 without requiring a demand to be filed, or last but certainly not least, why they paid themselves a total of $18,269.79 without a petition, hearing or order. * * * It is your Referee's opinion that the estate has been grossly mismanaged." We agree. From beginning to end appellant's administration of this estate has been marked by negligence, carelessness, inattention and indifference to duty, shocking and inexcusable failure to perform the duties of a fiduciary, departure from the requirements of the probate and tax laws, failure to conserve and collect the assets, and mismanagement. Appellant took seven years to "settle" an estate which should have been settled in two years, thereby causing unnecessary expenditure of $1,380 for bond premiums. He filed three settlements during a period in which he was required by law to make seven settlements. Duplicating items were included in the settlements without explanation. The settlements were not in proper form. They were vague, indefinite and uncertain as to date and identity of some items. Appellant failed to file proper receipts and vouchers; paid out of the estate monies for which no demands had been filed and allowed as required by law; failed to keep records; waived presentment and consented to the allowance of a claim for $2,320 as to part of which there was a good defense. He assumed control of farming operations on the lands of deceased without a probate court finding of necessity and requiring him to take possession and rent the same, contrary to Section 462.280, RSMo 1949, V.A.M.S.***, and without the posting of the bond required in such case, then improperly charged and credited himself in this estate with the receipts and disbursements from the farming operations. He paid himself a fee of $300 as guardian, without order of court, after the guardianship estate was closed; paid $431.25 as a premium for an indemnity bond for lost bonds for the actual possession of which he had receipted in writing; converted the property of his insane ward, failed to list it in the inventory, and used it for his own personal purposes. He took credit for a $7,969.79 commission which was excessive and improperly calculated, and paid his attorneys $10,000 without application to the probate court, proof of the nature and extent of the services rendered, or court order authorizing payment. He renewed his $100,000 administrator's bond after disbursing

*** Now Section 473.263 RSMo 1959, V.A.M.S.

$80,000 in a partial distribution. He completely ignored his duty to make and file state and federal tax returns on time; failed to file the preliminary federal estate tax notice when due. Penalties and interest were allowed to accrue on the federal estate tax. The state inheritance tax was certified due on July 23, 1953. Several letters demanding payment, and showing accrual of interest, were mailed by the department of revenue to appellant, who finally paid the tax on February 21, 1955. This delinquency cost $1,070.16 in accrued interest. He failed to file federal and state income tax returns for 1952, 1953 and 1954 on time. Penalties and interest accrued as a result of these delinquencies. Appellant hindered and delayed the processes of the probate and circuit courts. After this case finally reached the Adair County Circuit Court an heir filed fifteen interrogatories relating to the dividends, rights, etc. Appellant ignored and did not file answers to the interrogatories, as required by law. Although the case was set months in advance, appellant failed to appear at the trial to answer the serious charges made against him, but defaulted. After entering a default judgment the court ordered him to appear the next day and render a full accounting. Appellant ignored this order, which was personally served on him in time to appear. This was the culmination of seven years of dilatory tactics, unexcused delay and breach of trust.

Appellant's attorneys, who were employed from the beginning, must bear their share of the blame for appellant's delays, delinquencies and mismanagement, of which the inefficient, wasteful and inexcusable delay in finding and taking possession of the stocks and bonds is an outstanding example. The attorneys' claim that they earned a $10,000 fee is based principally upon their efforts to find and locate the stocks and bonds, and to prepare to cash them as lost securities. Appellant had not taken possession of these securities during the previous guardianship (with the exception of $15,000 of government bonds).

Appellant testified that in 1950, with knowledge that Nancy had a bank account, he asked banker Harold Smith whether she "had anything" (evidently referring to the securities) at the bank and that Smith answered, "No, we asked her to remove it." Appellant claimed that at the time of the death of Nancy he did not know where the stocks and bonds were and that prior to 1955 he was not aware of the fact that she had a safety deposit box. Nevertheless, appellant testified that after Nancy's death he made another inquiry of banker Smith and was informed that "they had asked her to remove her stuff at the bank" because "she was claiming that they were taking her stuff and going in her box." Appellant further testified that the appraisers, two of whom were officers of the bank, advised appellant that decedent did not have a safety deposit box. One of appellant's attorneys, however, testified that in his previous transactions with Nancy as her attorney over a 10-year period he knew that she had had a safety deposit box at the local bank; that at the beginning of the administration he received information "from those who were in the bank and who knew" that the stocks and bonds "were in there"; that he "supposed that all of her stocks and bonds would be in that box," and advised appellant that "he could perhaps find them over at the bank in her box."

No motive was shown to explain why the bankers would mislead the administrator into believing that the decedent left no safety deposit box at the bank, and as triers of the facts we find it difficult to accept this uncorroborated testimony. No banker or appraiser so testified, and it was contradicted by the attorney, who testified in one breath that the bankers told him the papers had been taken out but in the next breath stated that he had information from the bankers "who knew" that the securities "were in there," and who further testified that throughout the course of the administration he made inquiry at the bank about the box "a dozen times." If he was

satisfied that the bankers had told him the truth, as he claims, there would have been no occasion for him to make repeated inquiries over a period of years. That appellant had constructive if not actual notice of the existence of the box, follows from the fact that the bank made an annual rental charge against the administrator's bank account by placing among the cancelled checks debit slips for safety deposit box rent. These debit slips were dated March 19, 1951, March 19, 1952, March 18, 1953, March 24, 1954 and March 24, 1955. Appellant denied actual knowledge of these debit slips as they were issued through the years, claiming that all of them showed up at the same time, after he found the box in 1955. His excuse was that it was not his practice to obtain and look at his bank statements; that when he wanted to know the amount of his bank balance he would simply go to the bank and ask. This explanation is unreasonable and unacceptable. The inescapable fact is that appellant and his attorneys had information on the subject sufficient to put them on inquiry, which, if pursued with ordinary diligence, would have yielded up the box and its contents.

If appellant and his attorneys, acting upon information and belief that Nancy's securities were in a safety deposit box at the bank, had inquired at the bank and had been given unconfirmed information to the contrary, it would have been appellant's duty, and his attorneys should have so advised him, to make formal demand for possession of the box and contents and if the bank had refused and persisted in concealing or wrongfully withholding the box and its contents from the administrator, to institute proceedings for the discovery of assets under § 462.400, RSMo 1949, V.A.M.S.† There is no evidence that appellant made any request at the bank for information as to the date decedent was supposed to have removed her property from the bank and surrendered the box; or any

actual demand for access to the box, or any effort to utilize available legal procedure. Instead, proceeding upon the theory that decedent was an eccentric person who had hidden the securities in some out of the way place, appellant and his attorneys instituted a search for the stocks and bonds at the hospital where Nancy died, at her house, and elsewhere. They searched the bed, bedding and room at the hospital; went over her house "inch by inch," "from one end to the other"; "practically tore the house up"; went through her pocketbook and furniture; looked for an "old tin box" she "kept stuff in"; looked in boxes of old papers; checked the garage, the foundations of the house to see if they could find some loose bricks, and the cellar; interviewed the members of the family and a gentleman friend of the decedent; wrote to various agencies and companies trying to verify ownership and locate the missing stocks and bonds; wrote to the Treasury Department, the corporations, and bonding companies, procuring stop orders on transfers, getting information as to the procedure and cost of issuance of duplicate certificates and of securing refunding bonds to replace the "lost" securities (estimated at $8,000). During all the time this laborious search was in progress (a period of 3½ years) the bonds and stocks were resting securely in decedent's safety deposit box at the local bank. Finally, in 1955, in a conversation with a representative of a bonding company, appellant's attorney received a "tip" which convinced him that decedent had a box at the bank, and that the stocks and bonds were in the box. At that late date in the course of the administration counsel finally advised appellant to "go down to the bank and 'put them on the spot' and see if she didn't have a box there."

On this record appellant is not entitled to any fee as administrator. Commissions are allowed to administrators of

† Now Section 473.340 RSMo 1959, V.A.M.S.

estates of decedents as an incident to and compensation for the faithful performance of duties imposed by law and are to be denied where, as in this case, the record discloses flagrant mismanagement, conversion of assets, failure to comply with and total disregard for the laws and breach of trust in the performance of the duties of a fiduciary. In re Mills' Estate, 349 Mo. 611, 162 S.W.2d 807, 813; State ex rel. v. Taylor, 112 Mo.App. 585, 87 S.W. 7; State to use of Wolff v. Berning, 74 Mo. 87, 100.

[30, 31] Administrators are allowed all reasonable charges for "legal advice and service, and collecting and preserving the estate," to the time of filing the final settlement, under § 465.100, RSMo 1949, V.A.M.S.†, but an administrator cannot take credit as a matter of course for payments made for such services. There must be a judicial determination whether the services were *necessary* or *beneficial* to the estate. In re Mills' Estate, 238 Mo.App. 373, 183 S.W.2d 369, 374. It was the responsibility of the attorneys to represent, advise and assist the administrator in the proper discharge of the duties of his office. While there was general testimony that they performed the "usual services" of lawyers in administering estates, the administrator under questioning was unable to specify any particular services rendered by the attorneys, except in connection with the preparation and filing of some of the tax returns, "filling out the forms" of settlements, advice in connection with two matters, and efforts to locate and liquidate the stocks and bonds. Their tax work, a consistent record of delinquencies, penalties and interest, was detrimental to the estate. They did not prepare the inventory or the settlements, and were not entitled to pay at legal rates for merely filling in the forms (clerical work which should have been performed by the administrator). The record of services rendered is full of blanks.

Whether we fill in the blanks with advice given and acted upon, or failure to advise where advice was needed, the estate suffered in either event. On the two items of record with respect to which appellant says he consulted his attorneys (possible reduction of the administrator's bond and payment of the $2,320 doctor bill) the advice given was detrimental to the estate. With a certain remedy available the attorneys failed to advise the administrator how to ascertain whether decedent had a safety deposit box and how to gain access thereto, and participated in a wild goose chase which caused a 3½ year delay in making final settlement, with consequential detriment to the estate. The estate is not to be burdened with reimbursement of the sums the administrator paid these attorneys for their Herculean but misguided and futile efforts to locate and liquidate the "lost" stocks and bonds.

The judgment is reversed and the cause remanded for a hearing and determination on items 4, 10 and 11, a reconsideration of item 12, supra, and the entry of a new judgment as of August 3, 1961 confirming the preliminary order of June 16, 1958; sustaining the objections to and striking the final settlement; removing Lee S. McElhiney as administrator and revoking his letters of administration, and rendering final judgment on the accounting in accordance with the judgment of August 3, 1961, as modified by and in conformity with this opinion. The costs of this appeal are assessed against Lee S. McElhiney, individually.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.

†† Now Sections 473.153, 473.157 RSMo 1959, V.A.M.S.